E-FILED
Monday, 06 December, 2004 01:47:17 PM
Clerk, U.S. District Court, ILCD

## *MORGAN STANLEY DEAN WITTER*

FINANCIAL ADVISOR TRAINEE
EMPLOYMENT AGREEMENT

This Agreement is made between Dean Witter Reynolds Inc., a Delaware Corporation, (referred to as "Dean Witter") and _____ TIMOTHY R HUSEMAN _____ (referred to as the "Employee").

In consideration of Dean Witter's employment and compensation of the Employee as a trainee for a position as an Account Executive and Dean Witter's incurring of costs of training the Employee in Dean Witter's training program, and other good and valuable consideration, the parties hereby agree as follows:

### 1. CUSTOMER LISTS AND OTHER CONFIDENTIAL INFORMATION

1.1  All records and documents concerning the business and affairs of Dean Witter (hereinafter "Company Records"), and the right to use Company Records, are, and will always be the confidential and exclusive property of Dean Witter. Company Records include, but are not limited to, Dean Witter books and records; holding book or customer book pages; the names, addresses, telephone numbers, and assets and obligations carried in the accounts [commonly called positions"] of Dean Witter's customers; computer software or hardware for use in computer or word processing equipment; all training material forwarded to Employee during the training program including but not limited to books, papers, records, videotapes and recordings; and document or computer programs prepared or generated by the Employee by the use of Company Records. Company Records include the originals and all copies thereof. The Employee's use of Company Records will stop immediately upon the first of the following events to occur: the Employee's (1) voluntary or involuntary resignation, (2) retirement, (3) release, (4) discharge, (5) suspension, or (6) acceptance of other employment.

1.2  The Employee, during the course of his employment with Dean Witter, will not remove Company Records from the premises of Dean Witter in either original or copied form, except in the ordinary course of conducting business for, and subject to approval by, Dean Witter. The Employee will immediately deliver to Dean Witter, upon acceptance of other employment, at the time of termination of employment, or at any other time upon Dean Witter's request, any Company Records in the Employee's possession or control.

1.3  The Employee will not at any time assert any claim of ownership or other property interest in any Company Records. The Employee will permit Dean Witter to inspect any materials to be removed from Dean Witter offices when he accepts other employment or when his employment with Dean Witter is terminated.

1.4  The Employee will not disclose to any person or entity the contents, in whole or in part, of Company Records, except in the ordinary course of conducting business for Dean Witter.

1.5  Both during and subsequent to the course of his employment with Dean Witter, the Employee will not divulge to any person any information received during the course of his employment concerning the business of the firm and its financial affairs.

### 2. UNFAIR COMPETITION

2.1  For a period of one year following termination of employment for any reason, and within a radius of one hundred (100) miles from the Dean Witter office to which the Employee was last assigned, the Employee will not solicit or attempt to solicit, directly or indirectly, any of Dean Witter's customers who were served by or whose names became known to the Employee while in the employ of Dean Witter with respect to securities, commodities, financial futures, insurance, tax advantaged investments, mutual funds or any other line of business in which Dean Witter or any of its affiliates is engaged.

2.2  For a period of one year following termination of employment for any reason, the Employee will not, directly or indirectly, recruit or solicit any employee of Dean Witter for employment with any other organization which does business in securities, commodities, financial futures, insurance, tax advantaged investments, mutual funds or any other line of business in which Dean Witter or any of its affiliates is engaged.

### 3. RIGHT TO INJUNCTION

In the event the Employee breaches any of the promises concerning "Customer Lists And Other Confidential Information" or "Unfair Competition" contained in paragraphs 1 and 2 of this Agreement, the Employee acknowledges that Dean Witter's remedy at law for damages will be inadequate and that Dean Witter will be entitled to an injunction to prevent the Employee's prospective or continuing breach and to maintain the status quo pending arbitration as provided in paragraph 9 of this Agreement. Dean Witter's application to a court of law for an injunction will not constitute a waiver by Dean Witter of its right to arbitration as provided in paragraph 9 of this Agreement. The Employee further agrees that any court of law which issues an injunction shall refer any claim for damages to arbitration as provided in paragraph 9 of this Agreement.

### 4. REPAYMENT OF TRAINING COSTS

In the event of voluntary termination or termination for cause either of which occurs within three years from the date the Employee is assigned a Dean Witter production number, the Employee will pay to Dean Witter the amount of $50,000, representing the expense incurred by Dean Witter in training the Employee. This amount will be reduced by $8,333.33 for each full six-month period Employee is in production at Dean Witter. The above liquidated damages will not constitute liquidated damages for other breaches of this Agreement or losses to Dean Witter.



5.    HOLD HARMLESS

The Employee will indemnify and hold Dean Witter harmless against any and all losses or liabilities incurred by Dean Witter as the result of the Employee's breach of any of the promises herein, or due to the Employee's errors, customer account debits, commission deficits, rule violations or violations of Dean Witter's policies during the course of Employee's employment. Employee agrees that DWR shall have the right, without notice, to withhold from any amounts payable, due or held in an account for the Employee, as compensation or otherwise, amount(s) equal to any such losses or liabilities.

6.    TERMINATION OF EMPLOYMENT

The Employee's employment by Dean Witter may be terminated by either party at any time with or without cause.

7.    COMPENSATION

Provided Employee remains in full-time continuous employment with Dean Witter as an Financial Advisor Trainee, Dean Witter agrees to pay Employee a monthly salary of $ 2683.00 _____ during the training period prior to employee's going into production. Employee understands and agrees that this monthly salary covers all hours worked up to sixty hours in one week.

Employee understands and agrees that this salary will be calculated in the following manner:

$ 9.58 _____ hourly rate (first 40 hours)
$ 14.37 _____ time and one-half the hourly rate (hours 41-60 in a week)

Hours worked in excess of sixty (60) in any given workweek (Monday-Sunday) will be compensated at a rate of time and one-half the hourly rate stated above. Employee understands that work in excess of sixty (60) hours per workweek must have prior approval of Employee's branch manager.

Upon entering into production after the initial training program, Employee's compensation shall be paid in accordance with Dean Witter's standard compensation program for Financial Advisor Trainees and Financial Advisors as in effect from time to time.

8.    ENTIRE AGREEMENT

This writing constitutes the entire agreement of the parties with respect to the subject matter herein. This Agreement may be amended only by a writing signed by both the Employee and Dean Witter.

9.    ARBITRATION

Any controversy or claim arising out of or relating to this Agreement, or its breach, will be settled by arbitration before either the National Association of Securities Dealers, Inc. or the New York Stock Exchange, Inc., as Dean Witter may elect, in accordance with their respective rules, and judgment upon the award entered by the arbitrator(s) may be entered in any court having jurisdiction thereof. Employee agrees to stipulate, upon request by Dean Witter to expedited hearing procedures for such arbitration. This paragraph will not be deemed a waiver of Dean Witter's right to injunctive relief as provided for in paragraph 3 of this Agreement.

10.    SUCCESSORS

The benefits and obligations of this Agreement will run to the successors and assigns of Dean Witter.

11.    GOVERNING LAW

This Agreement will be governed and construed in accordance with the laws of the state where the Employee signs this Agreement, as indicated below.

12.    WAIVER

Dean Witter's failure to enforce a breach of any covenant of this Agreement will not constitute a waiver of Dean Witter's right to enforce any other breach of the same or any other covenant.

13.    SEVERABILITY

If any provision of this Agreement is, for any reason, adjudged to be void, invalid or unenforceable by an arbitrator or arbitration panel, a regulatory body or a court of law, the remainder of the Agreement will still continue and remain in full force and effect.

SIGNED IN THE STATE OF _____ ILLINOIS _____

10/22/01
Date

Employee's Signature

DEAN WITTER REYNOLDS INC.

10/25/01
Date

Branch Manager's Signature

DWR 9119   (5-82) Rev. 9-98 back

*426 069*

Exemplar

[Please delete all instructions appearing in BOLD as well as the clarifying footnotes prior to execution][1]

### JOINT PRODUCTION AGREEMENT
### (Joint Production Asset Addendum)

WHEREAS, this Agreement is being entered into on *Aug 1* , *03* (commencement date) solely for the convenience of *Stephen Hatton* ("Joint Producer 'A'") and *Darin Mullen* ("Joint Producer 'B'")[2] [3] (herein collectively the "Joint Producers") to better service clients and to share in commissions generated by customer accounts, and nothing in this Agreement is intended to affect, change, modify or otherwise alter in anyway Morgan Stanley DW Inc. d/b/a *Morgan Stanley's* ("Morgan Stanley) ownership of client accounts and documents, and confidential company records and information.

NOW, THEREFORE, the Joint Producers agree as follows:

Commencing *Aug 1* , *03*, the Joint Producers will enter into a joint production arrangement (the "Joint Production Arrangement") under the following terms and conditions.

A joint account number (the "Joint Account Number") will be set up for the Joint Production Arrangement. All client accounts to be handled under the Joint Account Number are set forth on the attached Addendum and will be deemed joint production assets (the "Joint Production Assets"). See Joint Production Asset Addendum attached hereto as Exhibit "A".

The Joint Producers agree to use their best efforts in furtherance of the Joint Production Arrangement. As between the Joint Producers, all gross commissions generated under the Joint Account Number will be split between the Joint Producers as follows: [Please select only one]:

(a)     Joint Producer A *50*% and Joint Producer B *50*%; or

(b)     Joint Producer A will pay to Joint Producer B on a monthly basis the fixed amount of $_____ to be charged against Joint Producer A's monthly Joint Production commission distribution. [This selection is to be used in the instance that one Joint Producer is on salary and not receiving commissions, such as an FA Trainee. Keep in mind that Joint Production Agreements may be used only with Financial Advisors.]

---

[1]     This is an "exemplar" and is not to be used as a form. After you have decided on the terms of the Joint Production Agreement (the "JPA"), please delete the instructive heading and the footnote designations. You may also eliminate the selections which you are not using.

[2]     JPAs may be comprised of any number of FAs. Add Joint Producers C, D and E as needed. Under no circumstances may a JPA include a Registered or Non-Registered Sales Assistant. In addition, no JPA may contain Joint Producers from more than one branch without prior written approval of the Compliance Department and of each affected Branch Manager and Regional Director.

[3]     Each Joint Producer must sign his/her own Joint Production Acknowledgement. Thus, if there are 3 Joint Producers, there will be 3 separate Acknowledgements.

In the event there is any disagreement with respect to such division, such dispute will be determined by the then Branch Manager of the last Morgan Stanley branch office to which all Joint Producers were jointly assigned along with the respective current Regional Director.

The Joint Production Arrangement may be terminated at any time by any Joint Producer without notice. In the event of termination of the Joint Production Arrangement no commissions will be divided after the date of termination and the Joint Production Arrangement Assets will be divided as follows:

**[Select only one, check the appropriate box and delete the selections not used. Include percentages (%) as indicated.]**

(a) ___ % to Joint Producer A; and ___ % to Joint Producer B on a capital asset basis as of the date of termination of the Joint Production Arrangement [ ].

or

(b) (i) client accounts opened prior to commencement of the Joint Production Arrangement (and all derivative accounts opened at anytime) will revert to the Joint Producer who brought the client account to the Joint Production Arrangement; and

(ii) all client accounts opened after commencement of the Joint Production Arrangement (except for the derivative accounts referenced in (b) (i) above will be divided _____ % to Joint Producer A, and ____ % to Joint Producer B on a capital asset basis as of the date of termination of the Joint Production Arrangement[ ].

or

(c) 100% to the Branch Manager of the last branch office to which all Joint Producers were jointly assigned for distribution in accordance with management discretion [ ].

In the event there is any disagreement with respect to such termination of the Joint Production Arrangement or division of the Joint Production Assets, such dispute will be determined by the then Branch Manager of the last Morgan Stanley branch office to which all Joint Producers were jointly assigned along with the respective Regional Director.

Joint Producers will continue to share in commissions during periods of short term disability covered under the Morgan Stanley Short Term Disability Plan. However, in the event of death or total permanent disability (as that term is defined in the Morgan Stanley Long Term Disability Plan) or termination of employment for any reason from Morgan Stanley by any Joint Producer, the Joint Production Arrangement Assets will be divided as follows:

**[Select only one of the following (delete the ones not used) and include percentages]**

(a) Revert ____% to the remaining or surviving joint producer {This is the most common option];

or

(b) ___% to Joint Producer A and ___% to Joint Producer B [Use only if there are more than 2 JPs in the JPA] ;

2

or

(c) Revert 100% to the then Branch Manager of the last branch office to which all Joint Producers were jointly assigned for distribution in accordance with management discretion;

or

(d) _ % to the remaining or surviving Joint Producer and __ % to the then Branch Manager of the last branch officer to which all Joint Producers were jointly assigned for distribution in accordance with management discretion.

In the event there is any disagreement with respect to such division, such dispute will be determined by the then Branch Manager of the last Morgan Stanley branch office to which all Joint Producers were jointly assigned along with the respective Regional Director.

Any controversy or claim relating to the enforceability of this Agreement will be settled through the CARE Program and its process. Should this matter be brought to mediation or arbitration and any provision(s) of this Agreement, for any reason, be adjudged void, invalid, or unenforceable by an arbitrator or arbitration panel, a regulatory body or a court of law, the remainder of the Agreement will still continue and remain in full force and effect. This Agreement may be modified only by a writing signed by all Joint Producers and with the approval and authorization of Morgan Stanley.

This Agreement is subordinate to any agreement between any Joint Producer and Morgan Stanley, and the Agreement may exist only so long as it is acceptable to Morgan Stanley and in accord with its policies and procedures. Morgan Stanley may terminate the Joint Production Arrangement at any time and without notice. Nothing in this Agreement shall be construed to amend or modify any policy or procedure of Morgan Stanley or any management directive currently existing or as may exist in the future, or any rule or regulation of any regulatory or securities organization or agency. Nor shall this Agreement be construed to amend or modify the Joint Production Arrangement Acknowledgments.

3

This Agreement shall be construed in accordance with the laws of the State of _____ [Use State Where Branch Is Located].

By signing below each Joint Producer acknowledges that he/she understands and agrees to all of the terms and conditions of the Agreement.

8/7/03
DATE

8/5/03
DATE

Joint Producer A

Joint Producer B

Reviewed For Morgan Stanley DW Inc.

BY: _____
Branch Manager

Date: 8/4/03

4

## JOINT PRODUCTION ASSET ADDENDUM
### Attached as Exhibit A to the Joint Production Agreement

For purposes of the Joint Production Agreement dated $8/1$; _____, $2003$ between _Steve Patton_ (Joint Producer A), and _Darin_ (Joint Producer B) [4], Joint Production Assets shall include the following:    _Muller_

**Please select one or more as appropriate:**

(a)    All client accounts opened by any Joint Producer prior to and after commencement of the Joint Production Agreement. [  ],

(b)    All client accounts opened by any Joint Producer after commencement of the Joint Production Agreement [  ],

(c)    All client accounts opened by Joint Producer ___ **prior** to commencement of the Joint Production Agreement. [  ],

(d)    All client accounts opened by Joint Producer __ **after** commencement of the Joint Production Agreement [  ],

(e)    All client accounts selected by each individual Joint Producer in his or her sole discretion for transfer from time to time into the Joint Production Number. [  ],

(f)    All client accounts derived from and opened as a result of other Joint Production Assets. [  ];

(f)    All client accounts opened as the result of joint marketing efforts. [  ];

(g)    All _____ client accounts opened by the Partners. [  ]

(h)    All client accounts specifically identified on this list below. {add pages if needed} [  ]

Joint Producer A _Steve_

Joint Producer B _Darin_

$8/7/03$
Date

$8/5/03$
Date

---

[4] See Footnote 2 of the Joint Production Agreement.

5

Exemplar
[Please delete all instructions appearing in BOLD as well as the clarifying footnotes prior to execution][1]

## JOINT PRODUCTION AGREEMENT
### (Joint Production Asset Addendum)

**WHEREAS**, this Agreement is being entered into on 2-9 , 04 (commencement date) solely for the convenience of *Less Hardy* ("Joint Producer 'A'") and *Tim Harms* ("Joint Producer 'B'")[2, 3] (herein collectively the "Joint Producers") to better service clients and to share in commissions generated by customer accounts, and nothing in this Agreement is intended to affect, change, modify or otherwise alter in anyway Morgan Stanley DW Inc. d/b/a *Morgan Stanley's* ("Morgan Stanley) ownership of client accounts and documents, and confidential company records and information.

**NOW, THEREFORE**, the Joint Producers agree as follows:

Commencing _____, _____, the Joint Producers will enter into a joint production arrangement (the "Joint Production Arrangement") under the following terms and conditions.

A joint account number (the "Joint Account Number") will be set up for the Joint Production Arrangement. All client accounts to be handled under the Joint Account Number are set forth on the attached Addendum and will be deemed joint production assets (the "Joint Production Assets"). See Joint Production Asset Addendum attached hereto as Exhibit "A".

The Joint Producers agree to use their best efforts in furtherance of the Joint Production Arrangement. As between the Joint Producers, all gross commissions generated under the Joint Account Number will be split between the Joint Producers as follows: **[Please select only one]:**

(a)    Joint Producer A 60% and Joint Producer B 40%; or

(b)    Joint Producer A will pay to Joint Producer B on a monthly basis the fixed amount of $_____ to be charged against Joint Producer A's monthly Joint Production commission distribution. **[This selection is to be used in the instance that one Joint Producer is on salary and not receiving commissions, such as an FA Trainee. Keep in mind that Joint Production Agreements may be used only with Financial Advisors.]**

---

[1]    This is an "exemplar" and is not to be used as a form. After you have decided on the terms of the Joint Production Agreement (the "JPA"), please delete the instructive heading and the footnote designations. You may also eliminate the selections which you are not using.

[2]    JPAs may be comprised of any number of FAs. Add Joint Producers C, D and E as needed. Under no circumstances may a JPA include a Registered or Non-Registered Sales Assistant. In addition, no JPA may contain Joint Producers from more than one branch without prior written approval of the Compliance Department and of each affected Branch Manager and Regional Director.

[3]    Each Joint Producer must sign his/her own Joint Production Acknowledgement. Thus, if there are 3 Joint Producers, there will be 3 separate Acknowledgements.

In the event there is any disagreement with respect to such division, such dispute will be determined by the then Branch Manager of the last Morgan Stanley branch office to which all Joint Producers were jointly assigned along with the respective current Regional Director.

The Joint Production Arrangement may be terminated at any time by any Joint Producer without notice. In the event of termination of the Joint Production Arrangement no commissions will be divided after the date of termination and the Joint Production Arrangement Assets will be divided as follows:

**[Select only one, check the appropriate box and delete the selections not used. Include percentages (%) as indicated.]**

(a) __ % to Joint Producer A; and __ % to Joint Producer B on a capital asset basis as of the date of termination of the Joint Production Arrangement [ ].

or

(b) (i) client accounts opened prior to commencement of the Joint Production Arrangement (and all derivative accounts opened at anytime) will revert to the Joint Producer who brought the client account to the Joint Production Arrangement; and

(ii) all client accounts opened after commencement of the Joint Production Arrangement (except for the derivative accounts referenced in (b) (i) above will be divided ____ % to Joint Producer A, and ___ % to Joint Producer B on a capital asset basis as of the date of termination of the Joint Production Arrangement[ ].

or

(c) 100% to the Branch Manager of the last branch office to which all Joint Producers were jointly assigned for distribution in accordance with management discretion [ ].

In the event there is any disagreement with respect to such termination of the Joint Production Arrangement or division of the Joint Production Assets, such dispute will be determined by the then Branch Manager of the last Morgan Stanley branch office to which all Joint Producers were jointly assigned along with the respective Regional Director.

Joint Producers will continue to share in commissions during periods of short term disability covered under the Morgan Stanley Short Term Disability Plan. However, in the event of death or total permanent disability (as that term is defined in the Morgan Stanley Long Term Disability Plan) or termination of employment for any reason from Morgan Stanley by any Joint Producer, the Joint Production Arrangement Assets will be divided as follows:

**[Select only one of the following (delete the ones not used) and include percentages]**

(a) Revert ___ % to the remaining or surviving joint producer {**This is the most common option**];

or.

(b) ___% to Joint Producer A and ___% to Joint Producer B [**Use only if there are more than 2 JPs in the JPA**] ;

2

or

(c) Revert 100% to the then Branch Manager of the last branch office to which all Joint Producers were jointly assigned for distribution in accordance with management discretion;

or

(d) _ % to the remaining or surviving Joint Producer and __ % to the then Branch Manager of the last branch officer to which all Joint Producers were jointly assigned for distribution in accordance with management discretion.

In the event there is any disagreement with respect to such division, such dispute will be determined by the then Branch Manager of the last Morgan Stanley branch office to which all Joint Producers were jointly assigned along with the respective Regional Director.

Any controversy or claim relating to the enforceability of this Agreement will be settled through the CARE Program and its process. Should this matter be brought to mediation or arbitration and any provision(s) of this Agreement, for any reason, be adjudged void, invalid, or unenforceable by an arbitrator or arbitration panel, a regulatory body or a court of law, the remainder of the Agreement will still continue and remain in full force and effect. This Agreement may be modified only by a writing signed by all Joint Producers and with the approval and authorization of Morgan Stanley.

This Agreement is subordinate to any agreement between any Joint Producer and Morgan Stanley, and the Agreement may exist only so long as it is acceptable to Morgan Stanley and in accord with its policies and procedures. Morgan Stanley may terminate the Joint Production Arrangement at any time and without notice. Nothing in this Agreement shall be construed to amend or modify any policy or procedure of Morgan Stanley or any management directive currently existing or as may exist in the future, or any rule or regulation of any regulatory or securities organization or agency. Nor shall this Agreement be construed to amend or modify the Joint Production Arrangement Acknowledgments.

3

This Agreement shall be construed in accordance with the laws of the State of _____ [Use State Where Branch Is Located].

By signing below each Joint Producer acknowledges that he/she understands and agrees to all of the terms and conditions of the Agreement.

_2-13-04_____
DATE

_2-11-04_____
DATE

_____
Joint Producer A Larry

_____
Joint Producer B Jim

**Reviewed For Morgan Stanley DW Inc.**

BY: _____
     Branch Manager

Date: _____

4

## JOINT PRODUCTION ASSET ADDENDUM
### Attached as Exhibit A to the Joint Production Agreement

For purposes of the Joint Production Agreement dated ____, ____, 200_, between _____ (Joint Producer A), and ____·____ (Joint Producer B) [4], Joint Production Assets shall include the following:

**Please select one or more as appropriate:**

(a)    All client accounts opened by any Joint Producer prior to and after commencement of the Joint Production Agreement. [  ],

(b)    All client accounts opened by any Joint Producer after commencement of the Joint Production Agreement [  ] ,

(c)    All client accounts opened by Joint Producer ___ **prior** to commencement of the Joint Production Agreement. [  ],

(d)    All client accounts opened by Joint Producer __ **after** commencement of the Joint Production Agreement [  ] ,

(e)    All client accounts selected by each individual Joint Producer in his or her sole discretion for transfer from time to time into the Joint Production Number. [  ].,

(f)    All client accounts derived from and opened as a result of other Joint Production Assets. [  ];

(f)    All client accounts opened as the result of joint marketing efforts. [  ];

(g)    All _____ client accounts opened by the Partners. [  ]

(h)    All client accounts specifically identified on this list below. {add pages if needed} [  ]


Joint Producer A   _Lee M_

Joint Producer B   _Ti M_

2-13-04
Date

2-11-04
Date

---

[4] See Footnote 2 of the Joint Production Agreement.

5

Exemplar

[Please delete all instructions appearing in BOLD as well as the clarifying footnotes prior to execution][1]

## JOINT PRODUCTION AGREEMENT
### (Joint Production Asset Addendum)

WHEREAS, this Agreement is being entered into on _1-12_ , _04_ (commencement date) solely for the convenience of _Steve Patton_ ("Joint Producer 'A'") and _David Lisneck_ ("Joint Producer 'B'")[2] [3] (herein collectively the "Joint Producers") to better service clients and to share in commissions generated by customer accounts, and nothing in this Agreement is intended to affect, change, modify or otherwise alter in anyway Morgan Stanley DW Inc.  d/b/a *Morgan Stanley's* ("Morgan Stanley") ownership of client accounts and documents, and confidential company records and information.

_David Willenbag_

NOW, THEREFORE, the Joint Producers agree as follows:

Commencing _1-12_ , _04_ the Joint Producers will enter into a joint production arrangement (the "Joint Production Arrangement") under the following terms and conditions.

A joint account number (the "Joint Account Number") will be set up for the Joint Production Arrangement. All client accounts to be handled under the Joint Account Number are set forth on the attached Addendum and will be deemed joint production assets (the "Joint Production Assets"). See Joint Production Asset Addendum attached hereto as Exhibit "A".

The Joint Producers agree to use their best efforts in furtherance of the Joint Production Arrangement. As between the Joint Producers, all gross commissions generated under the Joint Account Number will be split between the Joint Producers as follows: [Please select only one]:

(a)     Joint Producer A _64_% and Joint Producer B _35_ %; or _C _1_ %_

(b)     Joint Producer A will pay to Joint Producer B on a monthly basis the fixed amount of $_____ to be charged against Joint Producer A's monthly Joint Production commission distribution. [This selection is to be used in the instance that one Joint Producer is on salary and not receiving commissions, such as an FA Trainee. Keep in mind that Joint Production Agreements may be used only with Financial Advisors.]

---

[1]     This is an "exemplar" and is not to be used as a form. After you have decided on the terms of the Joint Production Agreement (the "JPA"), please delete the instructive heading and the footnote designations. You may also eliminate the selections which you are not using.

[2]     JPAs may be comprised of any number of FAs. Add Joint Producers C, D and E as needed. Under no circumstances may a JPA include a Registered or Non-Registered Sales Assistant. In addition, no JPA may contain Joint Producers from more than one branch without prior written approval of the Compliance Department and of each affected Branch Manager and Regional Director.

[3]     Each Joint Producer must sign his/her own Joint Production Acknowledgement. Thus, if there are 3 Joint Producers, there will be 3 separate Acknowledgements.

In the event there is any disagreement with respect to such division, such dispute will be determined by the then Branch Manager of the last Morgan Stanley branch office to which all Joint Producers were jointly assigned along with the respective current Regional Director.

The Joint Production Arrangement may be terminated at any time by any Joint Producer without notice. In the event of termination of the Joint Production Arrangement no commissions will be divided after the date of termination and the Joint Production Arrangement Assets will be divided as follows:

[Select only one, check the appropriate box and delete the selections not used. Include percentages (%) as indicated.]

(a) __ % to Joint Producer A; and __ % to Joint Producer B on a capital asset basis as of the date of termination of the Joint Production Arrangement [ ].

or

(b) (i) client accounts opened prior to commencement of the Joint Production Arrangement (and all derivative accounts opened at anytime) will revert to the Joint Producer who brought the client account to the Joint Production Arrangement; and

(ii) all client accounts opened after commencement of the Joint Production Arrangement (except for the derivative accounts referenced in (b) (i) above will be divided ____ % to Joint Producer A, and ____ % to Joint Producer B on a capital asset basis as of the date of termination of the Joint Production Arrangement[ ].

or

(c) 100% to the Branch Manager of the last branch office to which all Joint Producers were jointly assigned for distribution in accordance with management discretion [ ].

In the event there is any disagreement with respect to such termination of the Joint Production Arrangement or division of the Joint Production Assets, such dispute will be determined by the then Branch Manager of the last Morgan Stanley branch office to which all Joint Producers were jointly assigned along with the respective Regional Director.

Joint Producers will continue to share in commissions during periods of short term disability covered under the Morgan Stanley Short Term Disability Plan. However, in the event of death or total permanent disability (as that term is defined in the Morgan Stanley Long Term Disability Plan) or termination of employment for any reason from Morgan Stanley by any Joint Producer, the Joint Production Arrangement Assets will be divided as follows:

[Select only one of the following (delete the ones not used) and include percentages]

(a) Revert ____% to the remaining or surviving joint producer {This is the most common option];
or.
(b) ____% to Joint Producer A and ____% to Joint Producer B [Use only if there are more than 2 JPs in the JPA] ;

2

or

(c) Revert 100% to the then Branch Manager of the last branch office to which all Joint Producers were jointly assigned for distribution in accordance with management discretion;

or

(d) __ % to the remaining or surviving Joint Producer and __ % to the then Branch Manager of the last branch officer to which all Joint Producers were jointly assigned for distribution in accordance with management discretion.

In the event there is any disagreement with respect to such division, such dispute will be determined by the then Branch Manager of the last Morgan Stanley branch office to which all Joint Producers were jointly assigned along with the respective Regional Director.

Any controversy or claim relating to the enforceability of this Agreement will be settled through the CARE Program and its process. Should this matter be brought to mediation or arbitration and any provision(s) of this Agreement, for any reason, be adjudged void, invalid, or unenforceable by an arbitrator or arbitration panel, a regulatory body or a court of law, the remainder of the Agreement will still continue and remain in full force and effect. This Agreement may be modified only by a writing signed by all Joint Producers and with the approval and authorization of Morgan Stanley.

This Agreement is subordinate to any agreement between any Joint Producer and Morgan Stanley, and the Agreement may exist only so long as it is acceptable to Morgan Stanley and in accord with its policies and procedures. Morgan Stanley may terminate the Joint Production Arrangement at any time and without notice. Nothing in this Agreement shall be construed to amend or modify any policy or procedure of Morgan Stanley or any management directive currently existing or as may exist in the future, or any rule or regulation of any regulatory or securities organization or agency. Nor shall this Agreement be construed to amend or modify the Joint Production Arrangement Acknowledgments.

3

This Agreement shall be construed in accordance with the laws of the State of
_____ [Use State Where Branch Is Located].

By signing below each Joint Producer acknowledges that he/she understands and agrees
to all of the terms and conditions of the Agreement.

**SIGN HERE**

_____
DATE

2/3/04
_____
DATE

2/3/04
Date

_____
Joint Producer A  SP

_____
Joint Producer B  DJ

_____
C        DW

Reviewed For Morgan Stanley DW Inc.

BY: _____
      Branch Manager

Date: 2/9/04 _____

4

## JOINT PRODUCTION ASSET ADDENDUM
### Attached as Exhibit A to the Joint Production Agreement

For purposes of the Joint Production Agreement dated _____, _____, 200_, between _____ (Joint Producer A), and _____._____ (Joint Producer B) [4], Joint Production Assets shall include the following:

**Please select one or more as appropriate:**

(a)      All client accounts opened by any Joint Producer prior to and after commencement of the Joint Production Agreement. [   ],

(b)      All client accounts opened by any Joint Producer after commencement of the Joint Production Agreement [   ] ,

(c)      All client accounts opened by Joint Producer ____ **prior to** commencement of the Joint Production Agreement. [   ],

(d)      All client accounts opened by Joint Producer __ **after** commencement of the Joint Production Agreement [   ] ,

(e)      All client accounts selected by each individual Joint Producer in his or her sole discretion for transfer from time to time into the Joint Production Number. [   ],

(f)      All client accounts derived from and opened as a result of other Joint Production Assets. [   ];

(f)      All client accounts opened as the result of joint marketing efforts. [   ];

(g)      All _____ client accounts opened by the Partners. [   ]

(h)      All client accounts specifically identified on this list below. {add pages if needed} [   ]


Joint Producer A    *Stev*

Joint Producer B    *David L*

Date

Date    2/3/04


C *Purdu*    Date

<u>Exemplar</u>
**[Please delete all instructions appearing in BOLD as well as the clarifying footnotes prior to execution][1]**

### JOINT PRODUCTION AGREEMENT
(Joint Production Asset Addendum)

*Zvil Villenberg*

**WHEREAS**, this Agreement is being entered into on <u>1-12</u>, <u>04</u> (commencement date) solely for the convenience of <u>Steve Patton</u> ("Joint Producer 'A'") and <u>David Lisnek</u> ("Joint Producer 'B'")[2][3] (herein collectively referred to as the "Joint Producers") to better service clients and to share in commissions generated by customer accounts, and nothing in this Agreement is intended to affect, change, modify or otherwise alter in anyway Morgan Stanley DW Inc. d/b/a *Morgan Stanley's* ("Morgan Stanley) ownership of client accounts and documents, and confidential company records and information.

**NOW, THEREFORE**, the Joint Producers agree as follows:

Commencing <u>1-12</u>, <u>04</u> the Joint Producers will enter into a joint production arrangement (the "Joint Production Arrangement") under the following terms and conditions.

A joint account number (the "Joint Account Number") will be set up for the Joint Production Arrangement. All client accounts to be handled under the Joint Account Number are set forth on the attached Addendum and will be deemed joint production assets (the "Joint Production Assets"). See Joint Production Asset Addendum attached hereto as Exhibit "A".

The Joint Producers agree to use their best efforts in furtherance of the Joint Production Arrangement. As between the Joint Producers, all gross commissions generated under the Joint Account Number will be split between the Joint Producers as follows: **[Please select only one]:**

(a)    Joint Producer A <u>l</u> % and Joint Producer B <u>l</u> %; or <u>98</u> %

(b)    Joint Producer A will pay to Joint Producer B on a monthly basis the fixed amount of $_____ to be charged against Joint Producer A's monthly Joint Production commission distribution. **[This selection is to be used in the instance that one Joint Producer is on salary and not receiving commissions, such as an FA Trainee. Keep in mind that Joint Production Agreements may be used only with Financial Advisors.]**

---

[1]    This is an "exemplar" and is not to be used as a form. After you have decided on the terms of the Joint Production Agreement (the "JPA"), please delete the instructive heading and the footnote designations. You may also eliminate the selections which you are **not using.**

[2]    JPAs may be comprised of any number of FAs. Add Joint Producers C, D and E as needed. <u>Under no circumstances may a JPA include a Registered or Non-Registered Sales Assistant. In addition, no JPA may contain Joint Producers from more than one branch without prior written approval of the Compliance Department and of each affected Branch Manager and Regional Director.</u>

[3]    Each Joint Producer must sign his/her own Joint Production Acknowledgement. Thus, if there are 3 Joint Producers, there will be 3 separate Acknowledgements.

In the event there is any disagreement with respect to such division, such dispute will be determined by the then Branch Manager of the last Morgan Stanley branch office to which all Joint Producers were jointly assigned along with the respective current Regional Director.

The Joint Production Arrangement may be terminated at any time by any Joint Producer without notice. In the event of termination of the Joint Production Arrangement no commissions will be divided after the date of termination and the Joint Production Arrangement Assets will be divided as follows:

**[Select only one, check the appropriate box and delete the selections not used. Include percentages (%) as indicated.]**

(a) __ % to Joint Producer A; and __ % to Joint Producer B on a capital asset basis as of the date of termination of the Joint Production Arrangement [ ].

or

(b) (i) client accounts opened prior to commencement of the Joint Production Arrangement (and all derivative accounts opened at anytime) will revert to the Joint Producer who brought the client account to the Joint Production Arrangement; and

(ii) all client accounts opened after commencement of the Joint Production Arrangement (except for the derivative accounts referenced in (b) (i) above will be divided ____ % to Joint Producer A, and ___ % to Joint Producer B on a capital asset basis as of the date of termination of the Joint Production Arrangement[ ].

or

(c) 100% to the Branch Manager of the last branch office to which all Joint Producers were jointly assigned for distribution in accordance with management discretion [ ].

In the event there is any disagreement with respect to such termination of the Joint Production Arrangement or division of the Joint Production Assets, such dispute will be determined by the then Branch Manager of the last Morgan Stanley branch office to which all Joint Producers were jointly assigned along with the respective Regional Director.

Joint Producers will continue to share in commissions during periods of short term disability covered under the Morgan Stanley Short Term Disability Plan. However, in the event of death or total permanent disability (as that term is defined in the Morgan Stanley Long Term Disability Plan) or termination of employment for any reason from Morgan Stanley by any Joint Producer, the Joint Production Arrangement Assets will be divided as follows:

**[Select only one of the following (delete the ones not used) and include percentages]**

(a) Revert ___% to the remaining or surviving joint producer {This is the most common option];

or.

(b) ___% to Joint Producer A and ___% to Joint Producer B [Use only if there are more than 2 JPs in the JPA] ;

2

or

(c) Revert 100% to the then Branch Manager of the last branch office to which all Joint Producers were jointly assigned for distribution in accordance with management discretion;

or

(d) _ % to the remaining or surviving Joint Producer and __ % to the then Branch Manager of the last branch officer to which all Joint Producers were jointly assigned for distribution in accordance with management discretion.

In the event there is any disagreement with respect to such division, such dispute will be determined by the then Branch Manager of the last Morgan Stanley branch office to which all Joint Producers were jointly assigned along with the respective Regional Director.

Any controversy or claim relating to the enforceability of this Agreement will be settled through the CARE Program and its process. Should this matter be brought to mediation or arbitration and any provision(s) of this Agreement, for any reason, be adjudged void, invalid, or unenforceable by an arbitrator or arbitration panel, a regulatory body or a court of law, the remainder of the Agreement will still continue and remain in full force and effect. This Agreement may be modified only by a writing signed by all Joint Producers and with the approval and authorization of Morgan Stanley.

This Agreement is subordinate to any agreement between any Joint Producer and Morgan Stanley, and the Agreement may exist only so long as it is acceptable to Morgan Stanley and in accord with its policies and procedures. Morgan Stanley may terminate the Joint Production Arrangement at any time and without notice. Nothing in this Agreement shall be construed to amend or modify any policy or procedure of Morgan Stanley or any management directive currently existing or as may exist in the future, or any rule or regulation of any regulatory or securities organization or agency. Nor shall this Agreement be construed to amend or modify the Joint Production Arrangement Acknowledgments.

This Agreement shall be construed in accordance with the laws of the State of _____ [Use State Where Branch Is Located].

By signing below each Joint Producer acknowledges that he/she understands and agrees to all of the terms and conditions of the Agreement.

**SIGN HERE**

_____
DATE

_2/5/07_
DATE

_____    Joint Producer A    $\mathcal{SP}$

_____    Joint Producer B    $\mathcal{DL}$

Reviewed For Morgan Stanley DW Inc.

BY: _____    Date: _____
Branch Manager

Exemplar
[Please delete all instructions appearing in BOLD as well as the clarifying footnotes prior to execution][1]

## JOINT PRODUCTION AGREEMENT
### (Joint Production Asset Addendum)

**WHEREAS**, this Agreement is being entered into on _3·30_, _04_ (commencement date) solely for the convenience of _Steve Peton_ ("Joint Producer 'A'") and _David Willen__ ("Joint Producer 'B'")[2] [3] (herein collectively the "Joint Producers") to better service clients and to share in commissions generated by customer accounts, and nothing in this Agreement is intended to affect, change, modify or otherwise alter in anyway Morgan Stanley DW Inc. d/b/a *Morgan Stanley's* ("Morgan Stanley) ownership of client accounts and documents, and confidential company records and information.

**NOW, THEREFORE,** the Joint Producers agree as follows:

Commencing _____, _____, the Joint Producers will enter into a joint production arrangement (the "Joint Production Arrangement") under the following terms and conditions.

A joint account number (the "Joint Account Number") will be set up for the Joint Production Arrangement. All client accounts to be handled under the Joint Account Number are set forth on the attached Addendum and will be deemed joint production assets (the "Joint Production Assets"). See Joint Production Asset Addendum attached hereto as Exhibit "A".

The Joint Producers agree to use their best efforts in furtherance of the Joint Production Arrangement. As between the Joint Producers, all gross commissions generated under the Joint Account Number will be split between the Joint Producers as follows: [**Please select only one**]:

(a)     Joint Producer A ___% and Joint Producer B ___%; or

(b)     Joint Producer A will pay to Joint Producer B on a monthly basis the fixed amount of $_____ to be charged against Joint Producer A's monthly Joint Production commission distribution. [**This selection is to be used in the instance that one Joint Producer is on salary and not receiving commissions, such as an FA Trainee. Keep in mind that Joint Production Agreements may be used only with Financial Advisors.**]

---

[1]     This is an "exemplar" and is not to be used as a form. After you have decided on the terms of the Joint Production Agreement (the "JPA"), please delete the instructive heading and the footnote designations. You may also eliminate the selections which you are not using.

[2]     JPAs may be comprised of any number of FAs. Add Joint Producers C, D and E as needed. Under no circumstances may a JPA include a Registered or Non-Registered Sales Assistant. In addition, no JPA may contain Joint Producers from more than one branch without prior written approval of the Compliance Department and of each affected Branch Manager and Regional Director.

[3]     Each Joint Producer must sign his/her own Joint Production Acknowledgement. Thus, if there are 3 Joint Producers, there will be 3 separate Acknowledgements.

In the event there is any disagreement with respect to such division, such dispute will be determined by the then Branch Manager of the last Morgan Stanley branch office to which all Joint Producers were jointly assigned along with the respective current Regional Director.

The Joint Production Arrangement may be terminated at any time by any Joint Producer without notice. In the event of termination of the Joint Production Arrangement no commissions will be divided after the date of termination and the Joint Production Arrangement Assets will be divided as follows:

[Select only one, check the appropriate box and delete the selections not used. Include percentages (%) as indicated.]

(a) 77% to Joint Producer A; and 1 % to Joint Producer B on a capital asset basis as of the date of termination of the Joint Production Arrangement [ ].

or

(b) (i) client accounts opened prior to commencement of the Joint Production Arrangement (and all derivative accounts opened at anytime) will revert to the Joint Producer who brought the client account to the Joint Production Arrangement; and

(ii) all client accounts opened after commencement of the Joint Production Arrangement (except for the derivative accounts referenced in (b) (i) above will be divided ____ % to Joint Producer A, and ___ % to Joint Producer B on a capital asset basis as of the date of termination of the Joint Production Arrangement[ ].

or

(c) 100% to the Branch Manager of the last branch office to which all Joint Producers were jointly assigned for distribution in accordance with management discretion [ ].

In the event there is any disagreement with respect to such termination of the Joint Production Arrangement or division of the Joint Production Assets, such dispute will be determined by the then Branch Manager of the last Morgan Stanley branch office to which all Joint Producers were jointly assigned along with the respective Regional Director.

Joint Producers will continue to share in commissions during periods of short term disability covered under the Morgan Stanley Short Term Disability Plan. However, in the event of death or total permanent disability (as that term is defined in the Morgan Stanley Long Term Disability Plan) or termination of employment for any reason from Morgan Stanley by any Joint Producer, the Joint Production Arrangement Assets will be divided as follows:

[Select only one of the following (delete the ones not used) and include percentages]

(a) Revert ____% to the remaining or surviving joint producer {This is the most common option];
or.
(b) ___% to Joint Producer A and ___% to Joint Producer B [Use only if there are more than 2 JPs in the JPA] ;

2

or

(c) Revert 100% to the then Branch Manager of the last branch office to which all Joint Producers were jointly assigned for distribution in accordance with management discretion;

or

(d) __ % to the remaining or surviving Joint Producer and __ % to the then Branch Manager of the last branch officer to which all Joint Producers were jointly assigned for distribution in accordance with management discretion.

In the event there is any disagreement with respect to such division, such dispute will be determined by the then Branch Manager of the last Morgan Stanley branch office to which all Joint Producers were jointly assigned along with the respective Regional Director.

Any controversy or claim relating to the enforceability of this Agreement will be settled through the CARE Program and its process. Should this matter be brought to mediation or arbitration and any provision(s) of this Agreement, for any reason, be adjudged void, invalid, or unenforceable by an arbitrator or arbitration panel, a regulatory body or a court of law, the remainder of the Agreement will still continue and remain in full force and effect. This Agreement may be modified only by a writing signed by all Joint Producers and with the approval and authorization of Morgan Stanley.

This Agreement is subordinate to any agreement between any Joint Producer and Morgan Stanley, and the Agreement may exist only so long as it is acceptable to Morgan Stanley and in accord with its policies and procedures. Morgan Stanley may terminate the Joint Production Arrangement at any time and without notice. Nothing in this Agreement shall be construed to amend or modify any policy or procedure of Morgan Stanley or any management directive currently existing or as may exist in the future, or any rule or regulation of any regulatory or securities organization or agency. Nor shall this Agreement be construed to amend or modify the Joint Production Arrangement Acknowledgments.

This Agreement shall be construed in accordance with the laws of the State of _____ [Use State Where Branch Is Located].

By signing below each Joint Producer acknowledges that he/she understands and agrees to all of the terms and conditions of the Agreement.

4 - 7 - 04
DATE

4 - 7 - 04
DATE

Joint Producer A

Joint Producer B

Reviewed For Morgan Stanley DW Inc.

BY:
Branch Manager

Date: 2/4/02

4

## JOINT PRODUCTION ASSET ADDENDUM
### Attached as Exhibit A to the Joint Production Agreement

For purposes of the Joint Production Agreement dated ____, _____, 200_, between _____ (Joint Producer A), and ____·____ (Joint Producer B) [4], Joint Production Assets shall include the following:

**Please select one or more as appropriate:**

(a)     All client accounts opened by any Joint Producer prior to and after commencement of the Joint Production Agreement. [    ],

(b)     All client accounts opened by any Joint Producer after commencement of the Joint Production Agreement [    ] ,

(c)     All client accounts opened by Joint Producer ____ **prior** to commencement of the Joint Production Agreement. [    ],

(d)     All client accounts opened by Joint Producer ___ **after** commencement of the Joint Production Agreement [    ] ,

(e)     All client accounts selected by each individual Joint Producer in his or her sole discretion for transfer from time to time into the Joint Production Number. [    ].,

(f)     All client accounts derived from and opened as a result of other Joint Production Assets. [    ];

(f)     All client accounts opened as the result of joint marketing efforts. [    ];

(g)     All _____ client accounts opened by the Partners. [    ]

(h)     All client accounts specifically identified on this list below. {add pages if needed} [    ]


_____
Joint Producer A

_____
Joint Producer B

4-7-c4
_____
Date

4-7-04
_____
Date

---

[4] See Footnote 2 of the Joint Production Agreement.

Stephen

JOINT PRODUCTION ACKNOWLEDGMENT[1]

I, _Patton_, acknowledge that by signing below, that any joint production agreement (the "Agreement") between me, _Stephen Patton_, and _Darin Mueller_ is being entered into solely to better service clients and to share in commissions generated by such clients' accounts and nothing in such Agreement is intended to affect, change, modify or otherwise alter in anyway Morgan Stanley DW Inc. d/b/a *Morgan Stanley's* ("Morgan Stanley") ownership of client accounts and documents, and confidential and company records and information. I understand and agree that customer accounts and client information of whatever kind and in whatever form are Morgan Stanley assets and do not belong to the partners, individually or jointly or to the joint production unit.

I understand and agree that neither Morgan Stanley nor any of its employees, officers, agents or assigns intends to or has in any way directly or indirectly provided me with legal advice or legal representation with respect to a joint production arrangement between me and _Darin Mueller_. Any information Morgan Stanley has provided to me with respect to a joint production arrangement has been informational only, and I have been advised and I understand that it is not legal advice.

I agree that I may not use trade names for any joint production arrangement that I enter into. Further, I understand and agree that I must be registered in the state(s) of each client account serviced by the joint production arrangement, and that joint production arrangements may only be between fully licensed and registered Morgan Stanley Financial Advisors.

I agree that Morgan Stanley may in its sole discretion require dissolution of any joint production arrangement that I may enter into at anytime and without notice. I understand that division of future commissions will end immediately upon the termination of the joint production arrangement.

I understand and agree, in the event of any dispute between me and my partner(s) arising out of the Agreement, including but not limited to, allocation of commissions, and the distribution of joint production assets on termination of the joint production arrangement, that the Branch Manager or Regional Director shall determine such allocation and distribution. I further understand and agree that distribution of client accounts may change based on customer requests. I also agree not to contact either directly or indirectly any customer for purposes of influencing distribution of accounts.

I understand and agree not to make any arrangements with respect to the joint production arrangement without prior written approval of Morgan Stanley, my Branch Manager and Regional Director.

I agree to cooperate within the joint production arrangement and use my best efforts in furtherance of Morgan Stanley business. I further agree not to make negative comments of any kind regarding current or former partners or any other Morgan Stanley employee.

I agree that any joint production arrangement which I may enter into with any other Morgan Stanley Financial Advisor must be reviewed and authorized by my Branch Manager. I agree that any such joint production arrangement is subordinate to any agreement or contract that

---

[1] The Acknowledgement may not be modified in any way except to change the number of participating Joint Producers.



I may have with Morgan Stanley and must be in accordance with Morgan Stanley policy and procedure, all management directives, and all regulatory, securities organization or agency rules and regulations.

I agree that any controversy or claim arising out of or relating to this Acknowledgement or any joint production arrangement or Joint Production Agreement, or their breach, will be settled by the respective branch manager and regional director and that any issue of enforceability will be settled through the CARE Program Process. In the event that mediation or arbitration is required such will be handled through the CARE Program Process and any judgment upon a determination or award entered by the respective mediators or arbitrators may be entered in any court having jurisdiction thereof.

Finally, I agree to indemnify and hold Morgan Stanley harmless for any and all claims or causes of action of whatever kind or nature arising out of or connected in any way with the joint production arrangement or its termination.

AGREED TO AND ACCEPTED:

Name of Partner  Steve

8/4/03

Date

Reviewed For Morgan Stanley DW Inc.

BY:

Branch Manager  Gary

JOINT PRODUCTION ACKNOWLEDGMENT[1]

I, *Stephen R. ___*, acknowledge that by signing below, that any joint production agreement (the "Agreement") between me, *David Wilkin* and _____ is being entered into solely to better service clients and to share in commissions generated by such clients' accounts and nothing in such Agreement is intended to affect, change, modify or otherwise alter in anyway Morgan Stanley DW Inc. d/b/a *Morgan Stanley's* ("Morgan Stanley") ownership of client accounts and documents, and confidential and company records and information. I understand and agree that customer accounts and client information of whatever kind and in whatever form are Morgan Stanley assets and do not belong to the partners, individually or jointly or to the joint production unit.

I understand and agree that neither Morgan Stanley nor any of its employees, officers, agents or assigns intends to or has in any way directly or indirectly provided me with legal advice or legal representation with respect to a joint production arrangement between me and *the red Wilkinburg*. Any information Morgan Stanley has provided to me with respect to a joint production arrangement has been informational only, and I have been advised and I understand that it is not legal advice.

I agree that I may not use trade names for any joint production arrangement that I enter into. Further, I understand and agree that I must be registered in the state(s) of each client account serviced by the joint production arrangement, and that joint production arrangements may only be between fully licensed and registered Morgan Stanley Financial Advisors.

I agree that Morgan Stanley may in its sole discretion require dissolution of any joint production arrangement that I may enter into at anytime and without notice. I understand that division of future commissions will end immediately upon the termination of the joint production arrangement.

I understand and agree, in the event of any dispute between me and my partner(s) arising out of the Agreement, including but not limited to, allocation of commissions, and the distribution of joint production assets on termination of the joint production arrangement, that the Branch Manager or Regional Director shall determine such allocation and distribution. I further understand and agree that distribution of client accounts may change based on customer requests. I also agree not to contact either directly or indirectly any customer for purposes of influencing distribution of accounts.

I understand and agree not to make any arrangements with respect to the joint production arrangement without prior written approval of Morgan Stanley, my Branch Manager and Regional Director.

I agree to cooperate within the joint production arrangement and use my best efforts in furtherance of Morgan Stanley business. I further agree not to make negative comments of any kind regarding current or former partners or any other Morgan Stanley employee.

I agree that any joint production arrangement which I may enter into with any other Morgan Stanley Financial Advisor must be reviewed and authorized by my Branch Manager. I agree that any such joint production arrangement is subordinate to any agreement or contract that

---

[1]    The Acknowledgement may not be modified in any way except to change the number of participating Joint Producers.

I may have with Morgan Stanley and must be in accordance with Morgan Stanley policy and procedure, all management directives, and all regulatory, securities organization or agency rules and regulations.

I agree that any controversy or claim arising out of or relating to this Acknowledgement or any joint production arrangement or Joint Production Agreement, or their breach, will be settled by the respective branch manager and regional director and that any issue of enforceability will be settled through the CARE Program Process. In the event that mediation or arbitration is required such will be handled through the CARE Program Process and any judgment upon a determination or award entered by the respective mediators or arbitrators may be entered in any court having jurisdiction thereof.

Finally, I agree to indemnify and hold Morgan Stanley harmless for any and all claims or causes of action of whatever kind or nature arising out of or connected in any way with the joint production arrangement or its termination.

AGREED TO AND ACCEPTED:

_____                    4- 7-04
Name of Partner                             Date

Reviewed For Morgan Stanley DW Inc.

BY: _____
Branch Manager



## JOINT PRODUCTION ACKNOWLEDGMENT[1]

I, _Steve Patten_, acknowledge that by signing below, that any joint production agreement (the "Agreement") between me _David Lisnek_ and _David Willenberg_ is being entered into solely to better service clients and to share in commissions generated by such clients' accounts and nothing in such Agreement is intended to affect, change, modify or otherwise alter in anyway Morgan Stanley DW Inc. d/b/a *Morgan Stanley's* ("Morgan Stanley") ownership of client accounts and documents, and confidential and company records and information. I understand and agree that customer accounts and client information of whatever kind and in whatever form are Morgan Stanley assets and do not belong to the partners, individually or jointly or to the joint production unit.

I understand and agree that neither Morgan Stanley nor any of its employees, officers, agents or assigns intends to or has in any way directly or indirectly provided me with legal advice or legal representation with respect to a joint production arrangement between me and _David Lisnek or David Willenberg_ Any information Morgan Stanley has provided to me with respect to a joint production arrangement has been informational only, and I have been advised and I understand that it is not legal advice.

I agree that I may not use trade names for any joint production arrangement that I enter into. Further, I understand and agree that I must be registered in the state(s) of each client account serviced by the joint production arrangement, and that joint production arrangements may only be between fully licensed and registered Morgan Stanley Financial Advisors.

I agree that Morgan Stanley may in its sole discretion require dissolution of any joint production arrangement that I may enter into at anytime and without notice. I understand that division of future commissions will end immediately upon the termination of the joint production arrangement.

I understand and agree, in the event of any dispute between me and my partner(s) arising out of the Agreement, including but not limited to, allocation of commissions, and the distribution of joint production assets on termination of the joint production arrangement, that the Branch Manager or Regional Director shall determine such allocation and distribution. I further understand and agree that distribution of client accounts may change based on customer requests. I also agree not to contact either directly or indirectly any customer for purposes of influencing distribution of accounts.

I understand and agree not to make any arrangements with respect to the joint production arrangement without prior written approval of Morgan Stanley, my Branch Manager and Regional Director.

I agree to cooperate within the joint production arrangement and use my best efforts in furtherance of Morgan Stanley business. I further agree not to make negative comments of any kind regarding current or former partners or any other Morgan Stanley employee.

I agree that any joint production arrangement which I may enter into with any other Morgan Stanley Financial Advisor must be reviewed and authorized by my Branch Manager. I agree that any such joint production arrangement is subordinate to any agreement or contract that

---

[1]     The Acknowledgement may not be modified in any way except to change the number of participating Joint Producers.

I may have with Morgan Stanley and must be in accordance with Morgan Stanley policy and procedure, all management directives, and all regulatory, securities organization or agency rules and regulations.

I agree that any controversy or claim arising out of or relating to this Acknowledgement or any joint production arrangement or Joint Production Agreement, or their breach, will be settled by the respective branch manager and regional director and that any issue of enforceability will be settled through the CARE Program Process. In the event that mediation or arbitration is required such will be handled through the CARE Program Process and any judgment upon a determination or award entered by the respective mediators or arbitrators may be entered in any court having jurisdiction thereof.

Finally, I agree to indemnify and hold Morgan Stanley harmless for any and all claims or causes of action of whatever kind or nature arising out of or connected in any way with the joint production arrangement or its termination.

AGREED TO AND ACCEPTED:

Name of Partner                                    Date

Reviewed For Morgan Stanley DW Inc.

BY:
Branch Manager

Stephen

JOINT PRODUCTION ACKNOWLEDGMENT[1]

I, *Patton*, acknowledge that by signing below, that any joint production agreement (the "Agreement") between me, *Stephen Patton*, and *Darin Mullen* is being entered into solely to better service clients and to share in commissions generated by such clients' accounts and nothing in such Agreement is intended to affect, change, modify or otherwise alter in anyway Morgan Stanley DW Inc. d/b/a *Morgan Stanley's* ("Morgan Stanley") ownership of client accounts and documents, and confidential and company records and information. I understand and agree that customer accounts and client information of whatever kind and in whatever form are Morgan Stanley assets and do not belong to the partners, individually or jointly or to the joint production unit.

I understand and agree that neither Morgan Stanley nor any of its employees, officers, agents or assigns intends to or has in any way directly or indirectly provided me with legal advice or legal representation with respect to a joint production arrangement between me and *Darin Mullen*. Any information Morgan Stanley has provided to me with respect to a joint production arrangement has been informational only, and I have been advised and I understand that it is not legal advice.

I agree that I may not use trade names for any joint production arrangement that I enter into. Further, I understand and agree that I must be registered in the state(s) of each client account serviced by the joint production arrangement, and that joint production arrangements may only be between fully licensed and registered Morgan Stanley Financial Advisors.

I agree that Morgan Stanley may in its sole discretion require dissolution of any joint production arrangement that I may enter into at anytime and without notice. I understand that division of future commissions will end immediately upon the termination of the joint production arrangement.

I understand and agree, in the event of any dispute between me and my partner(s) arising out of the Agreement, including but not limited to, allocation of commissions, and the distribution of joint production assets on termination of the joint production arrangement, that the Branch Manager or Regional Director shall determine such allocation and distribution. I further understand and agree that distribution of client accounts may change based on customer requests. I also agree not to contact either directly or indirectly any customer for purposes of influencing distribution of accounts.

I understand and agree not to make any arrangements with respect to the joint production arrangement without prior written approval of Morgan Stanley, my Branch Manager and Regional Director.

I agree to cooperate within the joint production arrangement and use my best efforts in furtherance of Morgan Stanley business. I further agree not to make negative comments of any kind regarding current or former partners or any other Morgan Stanley employee.

I agree that any joint production arrangement which I may enter into with any other Morgan Stanley Financial Advisor must be reviewed and authorized by my Branch Manager. I agree that any such joint production arrangement is subordinate to any agreement or contract that

---

[1]    The Acknowledgement may not be modified in any way except to change the number of participating Joint Producers.

I may have with Morgan Stanley and must be in accordance with Morgan Stanley policy and procedure, all management directives, and all regulatory, securities organization or agency rules and regulations.

I agree that any controversy or claim arising out of or relating to this Acknowledgement or any joint production arrangement or Joint Production Agreement, or their breach, will be settled by the respective branch manager and regional director and that any issue of enforceability will be settled through the CARE Program Process. In the event that mediation or arbitration is required such will be handled through the CARE Program Process and any judgment upon a determination or award entered by the respective mediators or arbitrators may be entered in any court having jurisdiction thereof.

Finally, I agree to indemnify and hold Morgan Stanley harmless for any and all claims or causes of action of whatever kind or nature arising out of or connected in any way with the joint production arrangement or its termination.

**AGREED TO AND ACCEPTED:**

Name of Partner  Steve

8/4/03

Date

Reviewed For Morgan Stanley DW Inc.

BY:

Branch Manager  Gary

JOINT PRODUCTION ACKNOWLEDGMENT[1]

I, _Tim Huseman_ acknowledge that by signing below, that any joint production agreement (the "Agreement") between me, _Larry Hurly_, and _____ is being entered into solely to better service clients and to share in commissions generated by such clients' accounts and nothing in such Agreement is intended to affect, change, modify or otherwise alter in anyway Morgan Stanley DW Inc. d/b/a *Morgan Stanley's* ("Morgan Stanley") ownership of client accounts and documents, and confidential and company records and information. I understand and agree that customer accounts and client information of whatever kind and in whatever form are Morgan Stanley assets and do not belong to the partners, individually or jointly or to the joint production unit.

I understand and agree that neither Morgan Stanley nor any of its employees, officers, agents or assigns intends to or has in any way directly or indirectly provided me with legal advice or legal representation with respect to a joint production arrangement between me and _____. Any information Morgan Stanley has provided to me with respect to a joint production arrangement has been informational only, and I have been advised and I understand that it is not legal advice.

I agree that I may not use trade names for any joint production arrangement that I enter into. Further, I understand and agree that I must be registered in the state(s) of each client account serviced by the joint production arrangement, and that joint production arrangements may only be between fully licensed and registered Morgan Stanley Financial Advisors.

I agree that Morgan Stanley may in its sole discretion require dissolution of any joint production arrangement that I may enter into at anytime and without notice. I understand that division of future commissions will end immediately upon the termination of the joint production arrangement.

I understand and agree, in the event of any dispute between me and my partner(s) arising out of the Agreement, including but not limited to, allocation of commissions, and the distribution of joint production assets on termination of the joint production arrangement, that the Branch Manager or Regional Director shall determine such allocation and distribution. I further understand and agree that distribution of client accounts may change based on customer requests. I also agree not to contact either directly or indirectly any customer for purposes of influencing distribution of accounts.

I understand and agree not to make any arrangements with respect to the joint production arrangement without prior written approval of Morgan Stanley, my Branch Manager and Regional Director.

I agree to cooperate within the joint production arrangement and use my best efforts in furtherance of Morgan Stanley business. I further agree not to make negative comments of any kind regarding current or former partners or any other Morgan Stanley employee.

I agree that any joint production arrangement which I may enter into with any other Morgan Stanley Financial Advisor must be reviewed and authorized by my Branch Manager. I agree that any such joint production arrangement is subordinate to any agreement or contract that

---

[1] The Acknowledgement may not be modified in any way except to change the number of participating Joint Producers.

217 228 9934    P. 97

I may have with Morgan Stanley and must be in accordance with Morgan Stanley policy and procedure, all management directives, and all regulatory, securities organization or agency rules and regulations.

I agree that any controversy or claim arising out of or relating to this Acknowledgement or any joint production arrangement or Joint Production Agreement, or their breach, will be settled by the respective branch manager and regional director and that any issue of enforceability will be settled through the CARE Program Process. In the event that mediation or arbitration is required such will be handled through the CARE Program Process and any judgment upon a determination or award entered by the respective mediators or arbitrators may be entered in any court having jurisdiction thereof.

Finally, I agree to indemnify and hold Morgan Stanley harmless for any and all claims or causes of action of whatever kind or nature arising out of or connected in any way with the joint production arrangement or its termination.

AGREED TO AND ACCEPTED:

Name of Partner

Date

Reviewed For Morgan Stanley DW Inc.

BY:
Branch Manager

## CODE OF CONDUCT ACKNOWLEDGEMENT

I certify that I have received, reviewed, understand and agree to be bound
by the Company's Code of Conduct· contained in my Employee Handbook.

I understand that my failure to comply with the principles contained in the
Code is grounds for disciplinary action up to and including termination of
employment.

Employee Name (Printed): _Christopher H. Noonan_

Employee Signature: _____

Office: _426 Spfld 1L_     Date: _1-23-95_

Please return this form to your Manager promptly.

## CODE OF CONDUCT ACKNOWLEDGEMENT

I certify that I have received, reviewed, understand and agree to be bound
by the Company's Code of Conduct contained in my Employee Handbook.

I understand that my failure to comply with the principles contained in the
Code is grounds for disciplinary action up to and including termination of
employment.

Employee Name (Printed): ___Stephen L. Patton___

Employee Signature: _____

Office: _____426_____    Date: _____

Please return this form to your Manager promptly.

## CODE OF CONDUCT ACKNOWLEDGEMENT

I certify that I have received, reviewed, understand and agree to be bound
by the Company's Code of Conduct contained in my Employee Handbook.

I understand that my failure to comply with the principles contained in the
Code is grounds for disciplinary action up to and including termination of
employment.

Employee Name (Printed): _____THOMAS A. Noonan_____

Employee Signature: _____

Office: ____426____          Date: __1/26/95__

Please return this form to your Manager promptly.

# MSDW Employee Code of Conduct 2001
## Acknowledgment Form

I have received a copy of the Morgan Stanley Dean Witter Code of Conduct 2001. I acknowledge that I have read the Code of Conduct, and that I understand and agree to abide by the requirements set forth therein. I agree that it is a condition of my employment that I will abide by the Code and any additional or amended policies and procedures issued from time to time for the purpose of ensuring compliance with statutory and regulatory provisions or maintaining the Firm's reputation and integrity. I understand that any violation of the Code may subject me to disciplinary action, up to and including dismissal, as well as possible civil and criminal penalties.

For employees in the U.K., Japan and Canada only: I have received and read a copy of the supplement to the MSDW Code of Conduct 2001 applying to the region of my employment. I understand that the supplement is part of the Code for the purposes of this acknowledgment, and I agree to abide by the requirements set forth therein.

For U.K. employees only: I consent to the use, including the international transfer, of information concerning me, including sensitive personal data, in the manner described in the UK supplement to the MSDW Code of Conduct 2001.

Employee Name:         Tim Huseman

Employee Signature:    _____

MSDW ID No.:           _____

Social Security No.:    325 · 60 · 7733

Date:                  10 / 3 / 0 1