E-FILED
Tuesday, 07 December, 2004  09:29:27 AM
Clerk, U.S. District Court, ILCD

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
SPRINGFIELD DIVISION

| | |
|---|---|
| MORGAN STANLEY DW, INC., | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| v. | )  CASE NO:  04-3263 |
| | ) |
| STEPHEN L. PATTON, CHRISTOPHER H. | ) |
| NOONAN, THOMAS A. NOONAN, and | ) |
| TIMOTHY R. HUSEMAN, | ) |
| | ) |
| **Defendants.** | ) |

*MEMORANDUM IN OPPOSITION TO PLAINTIFF'S MOTION
FOR TEMPORARY RESTRAINING ORDER
AND PRELIMINARY INJUNCTION*

COME NOW Defendants, Stephen L. Patton, Christopher H. Noonan, Thomas A. Noonan and Timothy R. Huseman, by and through their attorneys, Brown, Hay & Stephens, LLP, and Scott C. Helmholz and Almon A. Manson, and for their Memorandum In Opposition To Plaintiff's Motion For Temporary Restraining Order And Preliminary Injunction, state as follows:

*I.    INTRODUCTION*

Stephen L. Patton, Christopher H. Noonan, Thomas A. Noonan and Timothy R. Huseman ("Defendants"), respectfully request that this Court deny the Motion of Plaintiff, Morgan Stanley DW, Inc. ("Morgan Stanley"), for a Temporary Restraining Order that would prevent Defendants from using their skills to earn a living as securities brokers. Defendants have not violated any enforceable provision of their employment agreements, and have not improperly used or disclosed Plaintiff's trade secrets. On the contrary, Defendants acquired the vast majority of their clients before coming over to

1

Morgan Stanley.    Furthermore, each Defendant has utilized the same client communication method Morgan Stanley recommended when it recruited four of these five Defendants from Kemper Securities in 1994, namely a combination of written and verbal notices advising customers of their change of employment. Accordingly, Morgan Stanley has no basis in equity to complain here about conduct it previously recommended to these Defendants. Because Plaintiff has failed to introduce clear and convincing evidence demonstrating a right to temporary injunctive relief, its motion must be denied.

## II.    STATEMENT OF FACTS

The following facts are taken from Defendants' Affidavits.    (Defendants' Affidavits, Exhibits A-E).  Patrick Christopher Noonan, Thomas Noonan and Stephen Patton are all part of the same family and investment team.  In 1936, Patrick Noonan's father joined the investment firm of Dixon Bretscher Noonan Inc. ("DBN").  In February of 1990, DBN's assets, excluding the Defendant brokers' customers, were purchased by Blunt Ellis & Loewi/Kemper Securities Group.  In late 1992, the firm began doing business as Kemper Securities, Inc. ("Kemper").  All of the present Defendants, except Timothy Huseman, worked as brokers with DBN and later Kemper.

In October of 1994, Patrick Noonan and his two sons Thomas and Christopher Noonan, and nephew, Stephen Patton (hereinafter "the Noonan/Patton team") and a number of other Kemper brokers, were recruited by Morgan Stanley's predecessor Dean Witter Reynolds Inc. ("Dean Witter") to open a new office in Springfield, Illinois. Dean Witter encouraged all of the brokers departing from Kemper to immediately contact their customers, by phone and mail, to notify them of their new affiliation with Dean Witter.

The Noonan/Patton team had approximately 1800 clients who continued to do business with them after their relocation to Dean Witter.   These clients made up

2

approximately 80% of the business for Dean Witter's new Springfield office. Many of these customers' families had done business with members of the Noonan/Patton team for over 20 years. (Exhibit A-E).

On or about October 11, 1994, Kemper filed a complaint for injunctive relief against Dean Witter, Patrick, Thomas and Christopher Noonan, Stephen Patton and two other brokers. (Kemper Complaint, Exhibit F). Dean Witter, who provided the legal defense for all of the individual defendants, took the position that all of the customers who had transferred their accounts belonged to the individual Defendant brokers, not Kemper. (Dean Witter, et al., Verified Answer, Exhibit G). On or about October 13, 1994, the parties to the Kemper case entered into a stipulated Order for Preliminary Injunction, which in relevant part, did not prohibit any of the defendant brokers from contacting or accepting business from the customers they served while at Kemper. (Injunction Order, Exhibit H). More significantly, the stipulated Order gave the defendant brokers the right to obtain duplicate copies of any client's file who decided to transfer their account over from Kemper to Dean Witter. (Exhibit H, ¶¶ 6-7).

In 2001, Morgan Stanley hired Timothy Huseman as a broker. After coming to Morgan Stanley, Huseman joined the Noonan/Patton team and received about 50% of his clients from their existing book of business which had been built long before Defendants joined Morgan Stanley. The majority of Huseman's remaining customer base was built by cold calling, civic activities and referrals from social and business contacts.

On December 1, 2004, the Defendants[1] resigned their employment with Morgan Stanley and joined the new Springfield, Illinois office of Citigroup Global Markets, Inc.,

---

[1] Patrick A. Noonan, not named as a Defendant herein, retired from Morgan Stanley on November 2, 2004.

d.b.a. Smith Barney ("Smith Barney"). Defendants did not remove any original documents or copies of documents pertaining to their Morgan Stanley clients, either before or after terminating their employment.

Defendants have not solicited any of their clients in violation of the employment agreements. Defendants have merely advised family, friends and business associates of their new employment and change of address, an announcement that does not violate Plaintiff's rights under its employment agreements or the Illinois Trade Secrets Act. Indeed, the method used by Defendants to advise their clients of their new address was precisely the same method Morgan Stanley recommended when it recruited them from Kemper in 1994.

After resigning, Defendants telephoned and or mailed announcements to friends, family, acquaintances and clients advising them that they had accepted new employment with Smith Barney. These communications merely provided the recipient with an address and phone number where each Defendant could be contacted. They did not provide any other information or request that any client transfer their business. No Smith Barney materials were included with the announcements and no proprietary or confidential data was used to prepare the mailing. Indeed, a substantial portion of the list of names and addresses used to mail the announcements existed long before Defendants accepted employment with Morgan Stanley, and Defendants used this same information to address announcements when Morgan Stanley when recruited them from Kemper in 1994.

When Defendants resigned from Morgan Stanley, their team was generating commissions of approximately $3,000,000.00 per year, less than the production they

4

brought to Morgan Stanley from Kemper. In addition, at least 50% of their assets under management were directly attributable to clients they had come to know before becoming affiliated with Morgan Stanley. The balance of their business was from client referrals. Defendants received little assistance from Morgan Stanley in attracting new clients and few, if any, of their clients had a prior relationship with Morgan Stanley. Accordingly, Morgan Stanley had no proprietary or legitimate interest in the identities of clients that Defendants brought with them from Kemper in 1994.

When a financial advisor resigns from Morgan Stanley, it is the company's policy to inform clients that he or she is "no longer employed by the company," and to re-assign their affairs to another representative who is unfamiliar with the client's particular circumstances. Accordingly, distribution of an announcement is the only way in which Defendants' clients can be informed of their financial advisor's whereabouts. Such an announcement ensures that clients will be able to reach their chosen investment advisor in the event they need to do so or have questions that can only be answered by their long-time financial advisor. For this reason, courts and securities arbitration panels nationwide have repeatedly held that informational announcements do not constitute an improper solicitation violating a restrictive covenant nor misappropriation of trade secrets.

As there has been no actual or threatened violation of Plaintiff's rights, this Court should deny the request for a temporary restraining order and preserve the right of securities customers to make a choice of investment advisors.

## III.    LAW AND ARGUMENT

It is well settled that the burden on a plaintiff seeking injunctive relief is to produce clear and convincing evidence that: (1) there is a substantial likelihood it will prevail on each element of the claim for relief; (2) demonstrating irreparable injury and

inadequate remedy at law; and (3) that the interests of all persons involved, including the parties and the public, weigh in favor of granting the extraordinary relief. *Audio Properties, Inc. v. Kovach, et al.*, 275 Ill. App. 3d 145, 147 (1995); *Loewen Group Int'l, Inc. v. Haberichter*, 912 F.Supp. 388, 392 (N.D. Ill. 1996). The party seeking injunctive relief must do so by "clear and convincing evidence." *Garlock v. United Seal, Inc.*, 404 F.2d 256, 257 (6th Cir. 1968). When temporary injunctive relief is sought, the plaintiff must demonstrate that it is attempting merely to preserve the status quo pending a final hearing on the merits. *Office Mates 5, North Shore v. Hazen*, 234 Ill. App.3d 557 (1992). The facts supporting an application for injunctive relief must be pled based on personal knowledge, not "on information and belief". *Kinney v. Federal Sec., Inc.*, 2001 WL 219691 (N.D. Ill.)

### A.   *PLAINTIFF IS UNLIKELY TO PREVAIL ON THE MERITS*

To warrant injunctive relief, Plaintiff must demonstrate, by clear and convincing evidence, a likelihood that it will prevail upon its claims for violation of restrictive covenants and for the misappropriation of trade secrets. In this case, Plaintiff cannot establish that Defendants violated an enforceable non-solicitation agreement, and the circumstance that National Association of Securities Dealers ("NASD") arbitration panels routinely refuse to grant permanent injunctive relief in such cases underscores the weakness of any such claim here. Likewise, Plaintiff cannot demonstrate a violation of the Illinois Uniform Trade Secrets Act. Accordingly, this Court should deny the request for injunctive relief.

*1.*     *Plaintiff Has No Legitimate Interest In Restricting Solicitation Of Customers Not Originated At Morgan Stanley.*

In Illinois, restrictive covenants are generally disfavored and the burden is placed upon the employer to demonstrate that the terms are reasonable and necessary to advance a legitimate business interest:

> Illinois courts have long been hostile toward restrictive covenants as restraints on trade and contrary to sound public policy. *See Office Mates 5, North Shore, Inc. v. Hazen*, 234 Ill. App.3d 557, 599 N.E.2d 1072, 1080 (1992), appeal denied, 148 Ill. 2d 644, 610 N.E.2d 1266 (1993); *Central Specialties Co. v. Schaefer*, 318 F.Supp. 855, 857 (N.D. Ill. 1970). Restrictive covenants between employers and employees are particularly disfavored. *See Trailer Leasing Co. v. Associates Commercial Corp.*, 1996 WL 392135 at *1 (N.D. Ill. 1996) (citing *Jefco Laboratories, Inc. v. Carroo*, 136 Ill. App.3d 793, 483 N.E.2d 999, 1001 (1985). When examining a covenant not to compete under Illinois law, a court must determine whether the terms of the covenant are reasonable and whether the agreement is necessary to protect a legitimate business interest of the employer. *See Outsource International, Inc. v. Bartow*, 192 F.3d 662, 666-67 (7th Cir. 1999); *Office Mates*, 599 N.E.2d at 1080. Furthermore, a court must ascertain that the covenant is ancillary to a valid contract and subordinate to the contract's main purpose and that there is adequate consideration to support the covenant. *Francorp v. Siebert*, 126 F.Supp.2d 543, 545 (N.D. Ill. 2000).

Protection of an employer's customers or business from competition by a former employee is not a legitimate business interest warranting injunctive relief. Ordinarily, an employer has no legitimate proprietary interest in its customers. *Instrumentalist Co. v. Band, Inc.*, 134 Ill.App.3d 884, 892 (1st Dist. 1985). In fact, "[w]hile clientele may properly be called the customers of a particular business, they cannot be considered the 'property' of that business. While a business can have a proprietary interest in lists of customers which it maintains, no business has a proprietary interest in the customers

7

themselves." American Hardware Mut. Ins. Co. v. Moran, 545 F.Supp. 192, 197 (N.D.Ill. 1982).

Instead, in the case of a covenant not to compete, "[o]nly two legitimate business interests are recognized in Illinois: (1) 'near-permanent' relationships with customers, and (2) trade secrets or confidential information that a former employee has acquired through his or her employment and subsequently tried to use for his or her own benefit." *Unisource Worldwide, Inc. v. Carrara*, 244 F.Supp.2d 977, 985 (C.D. Ill. 2003), citing *Lawrence and Allen, Inc.*, 292 Ill.App.3d 131 (2nd Dist. 1997).

In this case, Plaintiff has failed to demonstrate a "legitimate business interest" warranting enforcement of such a broad and burdensome non-compete restriction. To begin with, Plaintiff cannot demonstrate a "near-permanent" relationship with its customers. Furthermore, at least one court has held that, due to the competitiveness of the insurance industry, the relationship between an insurance agency and its customers does not meet this test. *Rapp Ins. Agency v. Baldree*, 231 Ill.App.3d 1038 (5th Dist. 1992). The banking and brokerage industry is equally competitive and, like the insurance industry, its product is not unique to any given firm. Moreover, Plaintiff cannot even show that these clients were developed while Defendants were employed by Morgan Stanley. Accordingly, Plaintiff cannot demonstrate a "near-permanent" relationship with clients that were originally transferred to Morgan Stanley from Kemper by virtue of the efforts of the Noonan/Patton team in the first place.[2]

Plaintiff has also failed to demonstrate a legitimate interest in the protection of trade secrets acquired by Defendants through their employment. Defendants have not

---

[2]  Morgan Stanley explicitly recognized the "portable" nature of the Noonan/Patton team's customer base by agreeing to a "carve out" provision in the employment agreements that exempted pre-existing clients from the "unfair competition" provisions.

retained or used any trade secrets or confidential information belonging to Plaintiff. In a recent case applying Illinois law, the United States District Court for the Central District of Illinois refused to enforce a much less restrictive non-solicitation clause upon allegations that the former employees had misappropriated a customer list. *Unisource Worldwide,* 244 F.Supp.2d at 985. Refusing to grant a preliminary injunction, the Court held that "[i]nformation that is generally known by persons in the trade or that could easily be duplicated by reference to telephone directories or industry publications is not protectable" and does not qualify as a "legitimate business interest" warranting enforcement of a restrictive covenant. *Id.*

In fact, as a matter of law, Plaintiff cannot prevail because it failed to plead performance of all conditions precedent, contrary to Fed.R.Civ.P. 9(c). While Plaintiff is only required to plead performance of conditions precedent in general terms, Plaintiff failed to do so. Instead, Plaintiff simply recites a litany of actions it undertook for the supposed benefit of Defendants (see Comp., ¶¶14-16), without making any allegation that such actions were performed pursuant to the employment contracts Plaintiff alleges were breached. Plaintiff cannot succeed absent compliance with Rule 9(c).

In addition, Plaintiff cannot succeed with respect to its claim that Defendants have and will use Plaintiff's "confidential information". Pursuant to the employment contracts upon which Plaintiff relies, Plaintiff claims that "[A]ll records and documents concerning the business and affairs of Dean Witter (hereinafter "Company Records"), and the right to use Company Records, are, and will always be, the confidential and exclusive property of Morgan Stanley." (emphasis in original). Plaintiff's broad-based assertion that all of its records and documents concerning its business and affairs are "confidential" is

9

inconsistent with Illinois law. Rather than allege a substantive basis for its belief that each and every one of its documents is confidential, and thus protected, Plaintiff instead simply points to the parties' knowledge that these documents would be confidential in their respective employment agreements. Defendants' stipulation to treatment of certain documents as "confidential" in the employment agreements does not obviate Plaintiff's burden to establish that the information it seeks to protect is actually confidential or a trade secret. "It is improper under Illinois law to enforce a non-competition clause merely because the parties agreed to such an arrangement." *Advent Electronics Inc. v. Buckman*, 112 F.3d 267, 274 (7th Cir. 1997). Instead, "[A] court will only enforce provisions which are 'reasonably necessary to protect a legitimate business interest or to prevent improper and unfair competition.'" Id. at 274, quoting *Rao v. Rao*, 718 F.2d 219, 223 (7th Cir. 1983).

### 2. *Plaintiff Has Failed To Demonstrate A Solicitation Prohibited Under the Contract.*

Plaintiff has also failed to introduce evidence sufficient to find that Defendants have violated the non-solicitation clause contained in their employment agreements. The mere fact that certain customers have elected to transfer their accounts to Defendants' new employer is insufficient to establish a violation of a non-solicitation clause. *Prudential Securities, Inc. v. Plunkett*, 8 F.Supp.2d 514, 518 (E.D. Va. 1998). To show a likelihood of success on the claim for breach of a restrictive covenant, Plaintiff must show that Defendants "solicited" Plaintiff's customers in violation of an enforceable restrictive covenant. In this case, Defendants merely communicated the facts of their new employment and contact information to their friends, family, acquaintances and clients

via verbal and written announcements. However, they did not solicit, entice, request or urge any customer to transfer his or her account.

Courts throughout the country have held that a mere announcement or informational contact does not constitute a solicitation for purposes of enforcing a non-solicitation agreement. For instance, in *Wells v. Merrill Lynch, Pierce, Fenner & Smith,* 919 F. Supp. 1047, 1053 (E.D.Ky. 1994), the court held that "a mere informational contact between the [broker] and any former client does not constitute a solicitation under the [Merrill Lynch] employment agreements." The court defined an informational contact as "any written or oral contact that provides information about the [brokers'] whereabouts and how they may be contacted."

This definition of a solicitation has been adopted by a series of federal district courts when called upon to enforce non-solicitation agreements. In *Merrill Lynch, Pierce, Fenner & Smith v. Hageman,* No. 01-CV-0092, slip opinion (N.D. Ohio Jan. 17, 2001) (Exhibit I), the Court granted a temporary restraining order against a departing broker, but expressly authorized informational contacts between the broker and his former clients:

> The Court finds that a mere "information contact" between Hageman and any former client will not constitute a "solicitation." See, Wells v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 919 F.Supp. 1047, 1053 (E.D. Ky. 1994). An "information contact" consists only of "any written or oral contact that provides information about the Plaintiff's whereabouts and how they may be contacted." Id.

In *Merrill Lynch v. Oblon,* No. 99 C 5968 (N.D. Ill. Sept. 10, 1999) (Exhibit J, hearing transcript), the court ruled that written or oral announcements of a broker's new employment affiliation do not constitute prohibited solicitations:

> [T]he announcement of the broker that the broker has gone to Salomon Smith Barney, providing the phone number and other information. . . , if

that's the nature of the notice that's provided, it is my ruling that type of contact is not for the purpose of inviting, encouraging, or requesting any account to transfer from Merrill Lynch, or to open a new account at Salomon Smith Barney, or to otherwise have the customer of Merrill Lynch discontinue its patronage from Merrill Lynch or its business relationship with Merrill Lynch.

**The notice is for the purpose of informing the customer that the broker with whom the customer has been working at Merrill Lynch has moved to Salomon Smith Barney, and since. . . informing is not one of the restricted purposes in the Merrill Lynch financial consultant employment agreement, I believe that type of conduct is not a violation of the employment agreement by the defendants** .

[I] believe that the public has a right to know when a broker leaves one company and goes to another company, and I believe that at this point there has been no showing that defendants have done anything other than to inform their customers, Merrill Lynch's customers of their change of employment.

There is nothing that violates the employment agreement if the former Merrill Lynch employee accepts business that was neither invited, encouraged, or requested, as long as there was not an invitation or encouragement or a request to transfer, or open a new account, or otherwise discontinue patronage at Merrill Lynch .

And the public has a right to change brokers at any point in time .   .   . [P]eople can go wherever they want.

See Also, *Merrill Lynch, Pierce, Fenner & Smith v. O'Connor,* 194 F.R.D. 618, 620

(N.D.Ill 2000) (citing *Oblon* and holding that it is unlawful and unreasonable for Merrill

Lynch to prevent a broker from giving former customers notification of his new address).

Many other courts have recognized the distinction between a solicitation and an

announcement in other contexts outside the brokerage industry. For instance, the

California Supreme Court defines "solicit" as "to ask for with earnestness, to make

petition to, to endeavor to obtain, to awake or excite to action, to appeal to or to invite."

*Aetna Building Maintenance Co. v. West,* 39 Cal. 2d 198, 203 (1952), citing Black's Law

Dictionary, 3d ed. Applying this definition in the employment context, the court held that

"[m]erely informing customers of one's former employer of a change of employment, without more, is not solicitation." *Id.* at 204.[3]

NASD arbitration panels—the forum which will ultimately determine Plaintiff's entitlement to permanent injunctive relief[4]—have also consistently affirmed the right of financial consultants to send customer announcements disclosing a change of employment. For example, in *H&R Block Financial Advisors, Inc. v. Carmack*, NASD Case No. 00-05576 (Dec. 22, 2000) (Exhibit K), the panel held:

> In the majority of decisions, the rule concerning restrictive employment agreements holds that a departing employee does not violate that agreement or breach any fiduciary duty by sending an informational announcement to customers advising of a change in employment and a notice where he may be reached.  Absent more, such an announcement is not a solicitation within the proscription of the employment agreement . . .
>
> Claimant's request for injunctive relief regarding solicitation of brokerage business from respondent Carmack's customers *must* be denied because there has been no showing that respondents have breached those terms of the employment agreement. ***Despite language in the agreement to the contrary, the informational notices respondents did issue are permitted by law in the public interest.*** (emphasis added).

In another case, an NASD arbitrator not only invalidated a restrictive covenant that purported to prevent informational announcements, but actually ordered the former

---

[3] Many other courts have distinguished information announcements from client solicitation prohibited by restrictive covenants. *See, e.g., Moss, Adams & Co. v. Shilling*, 179 Cal. App. 3d 124, 126, 224 Cal. Rptr. 456, 457 (Cal. Ct. App. 1986) (holding as a matter of law that the "mailing of such an announcement does not constitute solicitation."); *American Credit Indemnity Co. v. Sacks*, 213 Cal. App. 3d 622, 633, 262 Cal. Rptr. 92, 99 (Cal. Ct. App. 1988) (holding that "even when a trade secret customer list exists, the common law cases acknowledge a right to announce a new business affiliation as contrasted with a solicitation for patronage."); *Hilb, Rogal & Hamilton Ins. Services v. Robb*, 33 Cal. App. 4th 1812, 1821-22, 39 Cal. Rptr. 2d 887, 892 (Cal. Ct. App. 1995) (the employee "lawfully informed some of [plaintiff's] clients of his change in employment and then complied with their instructions to move their accounts...."); *Carriage Hill Health Care, Inc. v. Hayden*, No. CIV. 96-101-SD, 1997 WL 833131 at *7 (D.N.H. Apr. 30, 1997) (salesman was "entitled" to use his former employer's customer information to "announce his new affiliation" with a competitor, even if that information was a trade secret); *McCallister Co. v. Kastella*, 170 Ariz. 455, 456-58, 825 P.2d 980, 981-83 (Ariz. App. 1992) (letter sent by employee to clients informing them that she was resigning in order to form a new business was not a "solicitation" and thus there was no breach of fiduciary duty).

[4] But for the limited exception contained in §10335 of the N.A.S.D. Code of Arbitration Procedure, this entire controversy would constitute a "required submission" to arbitration under Code §10201(a)(2).

employer to provide the departing broker with a list of his clients' names and addresses in order to send out such announcements. *Choski v. Merrill Lynch*, NASD No. 97-057701 (Dec. 10, 1997) (Exhibit L). Similarly, in *Nolen v. Merrill Lynch*, NASD No. 98-01012 (March 23, 1998) (Exhibit M), the NASD arbitrator upheld the broker's right to send out announcements to his customers and further ordered his former employer, Merrill Lynch, to "instruct its employees that they are to give the new business address and phone number of [the broker] to any customer who so inquires." In a case brought by Morgan Stanley after its brokers had used announcements to advise clients of their change in employment, the NASD arbitrator not only denied injunctive relief, but enjoined Morgan Stanley from making any further false and defamatory statements about its former brokers to their customers. *Morgan Stanley Dean Witter v. Shaffer*, (March 18, 2002) NASD Case No. 01-0674. (Exhibit N). Applying this same rationale, at least 108 different NASD arbitration panels have denied requests for permanent injunctive relief in these types of cases (Exhibit O).

Construing a non-solicitation clause to prohibit distribution of a purely informational announcement would interfere with the public's right to choose with whom they want to do business. Plaintiff's customers have come to rely upon Defendants' financial advice, and they have a right to know where their broker went after resigning his employment with Plaintiff. They also have a right to know the differences between the firms before making their decision. Certainly, Plaintiff is not going to provide its customers with the information they need to make a fully informed choice with respect to their accounts. Indeed, Plaintiff will probably not even tell its customers where Defendants are currently located or how to contact them. In today's volatile market, it is

14

imperative that every securities investor has prompt access to his or her trusted broker of choice.

### 3.    *Plaintiff Has Failed to Demonstrate A Violation of The Trade Secrets Act.*

Plaintiff also cannot establish a violation of the Illinois Trade Secrets Act ("ITSA"). In order to establish a violation of the ITSA, a plaintiff must plead and prove that it owned a trade secret and the secret was misappropriated. Master Tech Products, Inc. v. Prism Enterprises Inc., 2002 WL 475192 (N.D.Ill.). Specifically, a plaintiff must show that the information at issue is "(i) secret (that is not generally known in the industry"), (ii) misappropriated (that is, stolen from it, rather than developed independently or obtained from a third source), and, (iii) used in . . . defendants' business." Labor Ready Inc. v. Williams Staffing, LLC, 149 F.Supp.2d 398, 411 (N.D.Ill. 2001). It is insufficient to simply allege broad areas of technology and assert a misappropriation. Rather, a plaintiff must plead and prove concrete secrets. Composite Marine Propellers, Inc. v. Van Der Wolde, 962 F.2d 1263, 1266 (7th Cir. 1992). Plaintiff has failed to identify secret, misappropriated trade secrets that are used in Defendants' business.

Under 765 ILCS 1065/2, a " '[t]rade secret' means information, including but not limited to, technical or non-technical data, a formula, pattern, compilation, program, device, method, technique, drawing, process, financial data, or list of actual or potential customers or suppliers, that:

> (1)    is sufficiently secret to derive economic value, actual or potential, from not being generally known to other persons who can obtain economic value from its disclosure or use; and

(2)    is the subject of efforts that are reasonable under the circumstances to maintain its secrecy or confidentiality".

The names, addresses and telephone numbers of Defendants' clients do not qualify as trade secrets under Illinois law. Client names and addresses are not the property of Plaintiff. If the information belongs to anyone, it belongs to the clients. Plaintiff took no active steps to maintain the secrecy of this information, which can be readily obtained through proper means including the telephone directory. The courts of Illinois have held that customer names and addresses readily obtainable from a telephone book or publicly available directory do not constitute trade secrets. *Unisource Worldwide,* 244 F.Supp.2d at 985. Accordingly, NASD arbitration panels have repeatedly refused to find that use of client names, addresses and telephone numbers constitutes a violation of the various states' enactments of the Uniform Trade Secrets Act.

The brokerage industry has also recognized that customer names and addresses are not confidential information protected by contract or trade secrets law. The nation's three largest brokerage firms, Citigroup Global Markets, Merrill Lynch, Pierce, Fenner & Smith, Inc. and UBS Financial Services, Inc. recently executed a "protocol" recognizing that a broker may take client names, addresses, phone numbers and e-mail addresses upon his or her resignation. (Exhibit P). This protocol was reviewed and approved by both the Securities and Exchange Commission and the NASD. By permitting brokers to retain this information following termination of employment, the protocol implicitly recognizes that customer names and addresses do not constitute confidential information protected by statute, regulatory rules, industry policies or customs.

Finally, there is also no evidence that Defendants misappropriated trade secret information belonging to Plaintiff. Many of Defendants' clients are also friends, family, social or professional acquaintances. Their names and addresses may be found in Defendants' personal records as well as in public sources. Indeed, Defendants had such a list long before they ever joined Morgan Stanley, and Morgan Stanley cannot claim a

proprietary interest in this information. Accordingly, the mere fact that the announcement was distributed to Defendants' former clients does not establish a misappropriation of trade secrets where the information used to compile the mailing is available from public and non-proprietary sources.

Numerous courts have held that use of customer names and addresses to announce a new affiliation does not constitute a misappropriation of trade secrets. For instance, California has held that "the right to announce a new affiliation, even to trade secret clients of a former employer, is basic to an individual's right to engage in free competition" and does not constitute misappropriation or misuse of trade secrets. *American Credit Indemnity Co. v. Sacks,* 213 Cal. App.3d 622, 636 (1989). See also, *Hilb, Rogal and Hamilton Ins. Services v. Robb,* 33 Cal. App.4th 1812, 1821 (1995) (use of a trade secret customer list to merely inform clients of a change in employment does not violate the Uniform Trade Secrets Act).

As Plaintiff has failed to demonstrate a violation of the non-solicitation clause, a violation of the Illinois Uniform Trade Secrets Act, or any likelihood that it will succeed upon the merits of its claim for permanent injunctive relief before the NASD, this Court should deny Plaintiff's Motion for a Temporary Restraining Order.

### B.    PLAINTIFF HAS NOT DEMONSTRATED THAT IT WILL SUFFER IRREPARABLE HARM

Plaintiff has not introduced any evidence of irreparable injury for which it has no adequate remedy at law. The United States Supreme Court has repeatedly held that where money damages provide an adequate remedy, irreparable harm has not been demonstrated:

> [I]t seems clear that the temporary loss of income, ultimately to be recovered, does not usually constitute irreparable injury...' The key word in this consideration is <u>irreparable</u>. Mere injuries, however substantial, in terms of money, time and energy necessarily expended in the absence of a stay are not enough. The possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of

litigation, weighs heavily against a claim of irreparable harm.' *Sampson v. Murray,* 415 U.S. 61, 90 (1964), quoting *Virginia Petroleum Jobbers Ass'n v. FPC,* 259 F.2d 921, 925 (D.C. Cir. 1958). (emphasis added in original).

Applying this principle, other courts have refused to grant injunctions to brokerage firms in cases like this one, finding that the lost income, if any, can be determined with precision from the account records for the customers at issue. *Merrill Lynch, Pierce, Fenner & Smith v. Bishop,* 839 F. Supp. 68, 74 (D.Me. 1993); *Merrill Lynch, Pierce, Fenner & Smith v. DeLiniere,* 572 F.Supp. 246, 248-9 (N.D. Ga. 1983). For example, in *Bishop,* the court found that Merrill Lynch had ample documents available to calculate the extent of its alleged damages, including:

> Rather precise figures as to how many accounts Defendant was exposed to during his employment, the amount of assets represented by these accounts, and the precise dollar amounts of commissions generated annually by these accounts. These figures, at the least, set out discernible parameters for discovery as to the extent of damage incurred by Merrill Lynch on account of Defendants' alleged misconduct. *Bishop,* 839 F. Supp. at 74, fn. 5.

Moreover, in *American Hardware*, the court held that, even if a protectable interest was established, the fact that the amount of damages could be easily calculated afforded plaintiff a sufficient remedy. *American Hardware* at 199. Specifically, noting that the length of the restrictive covenant in *American Hardware* was two years, the court held that

> "all that is at stake under the facts here is that most two years' premiums . . . from a finite group of customers [d]efendant would, in any case, be free to solicit those customers once the two years were up . . . and with no established customer loyalty to [plaintiff] – as distinct from [defendant] individually – having been shown its financial loss for the limited period would be precisely measurable and fully recoverable in damages.

> This is not the stuff of which 'irreparable harm' or 'inadequate remedy at law' are made." Id. at 199.

Any damages sustained by Plaintiff as a result of Defendants' actions in this case are easily compensable by an award of damages. Every dollar earned by each Defendant can be traced precisely. Every trade and every dollar in commission earned is documented. Any future business that Plaintiff might have earned, but for Defendants' actions, is knowable to the penny.

Plaintiff's right to seek damages in an NASD arbitration is an adequate remedy at law. The industry has chosen arbitration as the mandatory forum for these disputes due to the arbitrator's specialized knowledge and expertise regarding the industry. With this knowledge, NASD arbitration panels are capable of determining the amount of revenue lost as a result of the alleged violation. Furthermore, it is a fact that these cases routinely settle for a percentage of the broker's prior twelve months' commissions. Thus, despite all the protestations about "irreparable harm" and "theft of proprietary documents," the plain truth is that an amount of money could be awarded to or accepted by Plaintiff as complete relief for its claims against each Defendant.

The National Association of Securities Dealers prohibits members from interfering "with a customer's request to transfer his or her account in connection with the change in employment of the customer's registered representative . . . [p]rohibited interference includes . . . seeking a judicial order or decree that would bar or restrict the submission, delivery or acceptance of a written request from a customer to transfer his or her account". NASD Notice To Members 02-07, with attachment A, Interpretive Material, IM-2110-7. (January 2002), Exhibit Q. As a consequence of IM-2110-7, Morgan Stanley has absolutely no protectible interest in customer accounts that are essentially portable.

As Plaintiff has not suffered irreparable harm and has an adequate remedy at law in a claim for damages before the NASD, this Court should deny Plaintiff's request for a Temporary Restraining Order.

### C.    THE BALANCE OF EQUITIES FAVORS DEFENDANT

The third factor relevant to granting injunctive relief requires the Court to balance the irreparable harm claimed by Plaintiff against the prejudice suffered by each Defendant and the public in the event injunctive relief is granted. In this case, the balance of equities clearly favors the Defendants. Defendants have spent their entire professional careers developing a relationship of trust and confidence with their clients. If the Court enjoins Defendants from contacting their clients, it could very well destroy their careers and cripple them financially for years to come. Customers who are suddenly unable to contact or locate their brokers are naturally left to question the broker's judgment. The customers are left with the impression that the broker did not bother to contact them, an impression typically encouraged by the brokerage firm. By contrast, Plaintiff, one of the largest banking and investment concerns in the world, will suffer no real harm in the event injunctive relief is not granted, and stands to lose, at most, an infinitesimally small percentage of its annual revenue.

In American Hardware, the court addressed the balance of equities as they relate to the limited timeframe of the restrictive covenant, holding that

> "if injunctive relief were granted and [defendants] ultimately prevailed on the merits, they would have been deprived of the benefit of customer relationships [defendant] personally has developed.  Those accounts represent the lion's share of his business contacts.  Loss of continuity because of the two-year hiatus in his dealing with them could be seriously damaging and make it difficult to rebuild the goodwill [defendant] (not [plaintiff] as a corporation) has created.  And, unless the injunction had been wrongfully granted (a very different question from simply reaching another conclusion on the ultimate merits), defendants would not be able

to recoup the damages for the resulting loss – though even if recoverable, damages would be an inadequate remedy in any case under the circumstances." American Hardware at 199-200.

It is common knowledge in the industry that Plaintiff files suit for temporary injunctive relief against every broker who resigns from the company. This practice has nothing to do with irreparable harm, but is used exclusively to extort a generous financial settlement from the departing broker and his or her new employer. While NASD arbitration panels almost never grant further injunctive relief, a temporary restraining order effectively deprives the broker of the right to make a living, and thereby stands as a powerful incentive to settle with the brokerage firm. Accordingly, the purpose and effect of temporary injunctive relief is merely to bludgeon a monetary settlement. This is not a proper purpose for temporary injunctive relief, particularly where the rights of the individual brokers to earn a living is weighed against the interests of a multinational corporation.

The interests of the public customers also weigh against granting injunctive relief. Addressing this issue, one court held that a brokerage customer's right to obtain financial advice from his or her chosen representative outweighs any interest of the brokerage firm:

> The fourth prong of the test is the public interest. Merrill Lynch seeks to prevent [a departed broker] from servicing accounts, which have or might transfer. This violates a client's rights to obtain financial advice from the source of his choice. This public interest outweighs [the firm's] interest in preventing [the broker] from obtaining this business. To prohibit a client from transferring his business to [the broker] would create substantial harm. As the testimony and argument presented during the hearing, as well as all financial industry advertising, makes clear: a broker client relationship is one of trust. It is not merely the mechanical process of giving advice and executing orders, rather it is a personal relationship which allows a client to sleep easy knowing that his financial interests are well shepherded." *Merrill Lynch, Pierce, Fenner & Smith v. Goodson*, 820

21

F. Supp. 1128, 1131 (S.D. Ind. 1993).  **[Morgan Stanley's ads/web site good to cite here].**

Applying this same principle, an NASD arbitrator in a recent case denied a request for injunctive relief by the claimant brokerage firm and ordered that the broker could use the information obtained from her clients to effect the orderly and prompt transfer of accounts:

> In this hearing for an interim injunction, both parties have made forceful arguments for the respective positions. However, a factor that must also be considered is how this matter between the Claimant and Respondent *affects the most important party in the retail brokerage industry, i.e., the retail client.* The relationship between the registered representative and the client is based on continuing trust and confidence, and the time and effort to develop this goodwill can be substantial. Also, the client depends on the registered representative for guidance in matters relating to retirement planning or the financing of college tuition.
>
> After taking into consideration the potential harm to the client as well as the Ohio Company and June Bolton, in this volatile world economy, and after considering Rules 10335 and 10324 of the NASD Code of Arbitration, it is decided to issue an interim injunction *in favor of the Claimant June Bolton and against Respondent Ohio Company.* The order shall permit June Bolton to apply the information obtained as a broker to *permit the orderly and prompt transfer of accounts as necessary. June Bolton v. The Ohio Company*, NASD Case No. 98-02755 (August 6, 1998) (emphasis added) (Exhibit R).

**D.    *PLAINTIFF'S REQUEST FOR INJUNCTIVE RELIEF IS BARRED BY THE DOCTRINE OF UNCLEAN HANDS AND JUDICIAL ESTOPPEL.***

Finally, Plaintiff's request for injunctive relief is barred by the doctrines of unclean hands and judicial estoppel. It is well established that a party seeking injunctive relief must come before the court with clean hands. *Keystone Driller Co. v. General Excavator Co.,* 290 U.S. 240 (1933). To the same effect, the doctrine of judicial estoppel prohibits a party from asserting a position contrary to another position raised in the same or previous litigation. *Teldyne Indus, Inc. v. NLRB,* 911 F.2d 1214, 1220 (6th Cir. 1990). Accordingly, courts have denied injunctive relief to brokerage firms which

simultaneously engage in the same practices for themselves that they challenge for others. *Morgan Stanley DW, Inc. v. Frisby,* 163 F.Supp.2d 1371 (N.D. Ga. 2001).

Under the doctrines of unclean hands and judicial estoppel, Plaintiff has no right to enjoin Defendants from conduct which it previously encouraged when it recruited them from Kemper. When Morgan Stanley recruited the Noonan Team, they were instructed to not only mail announcements to the customers but also to telephone them and request that they transfer their business to Morgan Stanley. Likewise, they were told that they could use a personal list of client names and addresses to deliver the announcements. Morgan Stanley then retained counsel for Defendants, who argued that this conduct did not violate Kemper's contract or the Illinois Trade Secrets Act.

It is well established that a securities brokerage firm cannot complain when it encouraged its employee to engage in the same behavior of which it now complains. *Salomon Smith Barney, Inc. v. Vockel,* 137 F.Supp.2d 599 (E.D. Pa. 2000). In *Vockel,* the plaintiff sought a restraining order preventing its former employee from misappropriating its customer records and information. However, the District Court found that the plaintiff had previously recruited the employee from Merrill Lynch and used Merrill Lynch account records to solicit its customers to transfer their accounts. Finding that the plaintiff had previously encouraged and aided the broker to engage in the same behavior of which it now complains, and that it had profited from that conduct after the broker transferred his accounts, the District Court denied the request for injunctive relief.

It is well known that Plaintiff routinely recruits brokers, and the brokers' clients, from other securities firms using the exact same methods used by the Defendants in this case. Indeed, most of the brokers in Plaintiff's Springfield office were recruited from other firms. As Defendants generated most of their clients before they ever became employed by Morgan Stanley, and Morgan Stanley has no legitimate interest in the clients that it transferred from Kemper using the same methods used by the Defendants in this case, this Court should deny the request for a Temporary Restraining Order.

*IV.    CONCLUSION*

For the foregoing reasons, Defendants respectfully request that the Court deny the

motion for temporary restraining order and stay further proceedings pending arbitration

before the NASD.

**STEPHEN L. PATTON, ET AL.,**
**Defendants,**

**s/Scott C. Helmholz, Esq.**
Registration No. 6186488
Brown, Hay & Stephens, LLP
205 South Fifth Street, Suite 700
P.O. Box 2459
Springfield, IL 62705
Telephone: (217) 544-8491
Facsimile: (217) 241-3111

### *PROOF OF SERVICE*

I hereby certify that on *December 7, 2004,* I electronically filed *Memorandum In Opposition To Plaintiff's Motion For Temporary Restraining Order And Preliminary Injunction* with the Clerk of the Court using the CM/ECF system which will send notification of such filings to the following:

Dennis Concilla, Esq.
Miles Hart, Esq.

and I certify that a copy was mailed to the following:

Gary M. Saretsky, Esq.
Hertz Schram & Saretsky, P.C.
1760 S. Telegraph Rd., Suite 300
Bloomfield, MI  48302-0183

Eric A. Michaels, Esq.
Hertz Schram & Saretsky, P.C.
1760 S. Telegraph Rd., Suite 300
Bloomfield, MI  48302-0183

**s/Scott C. Helmholz, Esq.**
Registration No. 6186488
Brown, Hay & Stephens, LLP
205 South Fifth Street, Suite 700
P.O. Box 2459
Springfield, IL  62705
Telephone:  (217) 544-8491
Facsimile:  (217) 241-3111

*EXHIBITS*

A.    Affidavit of Patrick Noonan

B.    Affidavit of Stephen Patton

C.    Affidavit of Christopher Noonan

D.    Affidavit of Thomas Noonan

E.    Affidavit of Timothy Huseman

F.    See Announcement, attached as Exhibit B to Kemper Securities, Inc.'s Complaint for Injunctive Relief, filed in No. 94 CH 170

G.    Verified Answer of Dean Witter, Inc. Patrick A. Noonan, Christopher H. Noonan, Thomas A. Noonan, Stephen L. Patton, Larry A. Hardy and Gary Seitz, filed in Case No. 94 CH 170

H.    Order for Preliminary Injunction, filed in No. 94 CH 170

I.    *Merrill Lynch, Pierce, Fenner & Smith v. Hageman,* No. 01-CV-0092, slip opinion (N.D. Ohio Jan. 17, 2001)

J.    *Merrill Lynch v. Oblon,* No. 99 C 5968, hearing transcript (N.D. Ill. Sept. 10, 1999)

K.    *H&R Block Financial Advisors, Inc. v. Carmack*, NASD Case No. 00-05576 (Dec. 22, 2000)

L.    *Choski v. Merrill Lynch*, NASD No. 97-057701 (Dec. 10, 1997)

M.    *Nolen v. Merrill Lynch*, NASD No. 98 01012 (March 23, 1998)

N.    *Morgan Stanley Dean Witter v. Shaffer*, (March 18, 2002) NASD Case No. 01-0674

O.    Index of 108 Arbitration Decisions

P.    Press Release – Broker Recruitment Protocol

Q.    NASD Notice to Members 02-07

R.    *June Bolton v. The Ohio Company*, NASD Case No. 98-02755 (August 6, 1998)