## IN THE CIRCUIT COURT FOR THE SEVENTH JUDICIAL CIRCUIT
## SANGAMON COUNTY, ILLINOIS

|  |  |  |
|---|---|---|
| KEMPER SECURITIES, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| DEAN WITTER REYNOLDS INC., | ) | No. |
| PATRICK A. NOONAN, LARRY A. HARDY, | ) | **94 CH 170** |
| CHRISTOPHER H. NOONAN, THOMAS A. | ) | |
| NOONAN, STEPHEN L. PATTON and | ) | |
| GARY SEITZ, | ) | |
| | ) | |
| Defendants. | ) | |

CHG-4   OCT 1 1 1994

Clerk of the Circuit Court

### VERIFIED COMPLAINT IN CHANCERY FOR
### INJUNCTIVE AND OTHER RELIEF

Plaintiff KEMPER SECURITIES, INC. ("Kemper"), by its attorneys, for its verified

complaint for injunctive and other relief against defendants Dean Witter Reynolds Inc.

("Dean Witter"), Patrick Noonan ("P. Noonan"), Larry Hardy ("Hardy"), Christopher Noonan

("C. Noonan"), Thomas Noonan ("T. Noonan"), Steven Patton ("Patton") and Gary Seitz

("Seitz") (collectively, the individual defendants are referred to herein as the "Defendant

Brokers"), alleges as follows:

### PARTIES

1.      Kemper is a Delaware corporation, with its principal place of business in

Chicago, Illinois.  Kemper is a broker-dealer in securities registered with the State of Illinois

and the National Association of Securities Dealers, Inc. ("NASD"). Kemper is also a member

of the New York Stock Exchange, Inc. ("NYSE") and other principal exchanges.   Kemper is

engaged in the business of selling investment products and services primarily to individual

investors.  Kemper maintains a branch office in Springfield, Illinois, among other locations nationwide.

2.    Dean Witter is a Delaware corporation with its principal place of business in New York, New York.  Dean Witter is a broker-dealer in securities registered with the State of Illinois, the NASD, the NYSE and other principal exchanges.  Dean Witter competes with Kemper in the business of selling investment products and services to individual investors.  As of October 7, 1994, Dean Witter did not have an operational branch office in Springfield, Illinois.

3.    On information and belief, the Defendant Brokers are all residents of or employed in Sangamon County, Illinois.

4.    Until he resigned from Kemper on October 7, 1994, P. Noonan was a senior vice president and registered principal for Kemper, and the branch office manager for Kemper's Springfield, Illinois branch office.

5.    Until they resigned en masse from Kemper on October 7, 1994, the other Defendant Brokers were registered representatives for Kemper employed at Kemper's Springfield branch office.

6.    While still employed by Kemper, P. Noonan and each of the Defendant Brokers had agreed to accept Dean Witter's offer of employment in order to open a new Springfield, Illinois branch office for Dean Witter.

## OVERVIEW

7.     During the past several months, Dean Witter has embarked on a campaign to raid Kemper's Springfield branch office by recruiting first Kemper's branch office manager and then Kemper's sales and support staff in that office, and obtaining confidential and proprietary Kemper documents and information, including Kemper's confidential customer information.

8.     To implement its plan, Dean Witter first recruited P. Noonan, and used his position and influence with the Defendant Brokers to recruit them to follow P. Noonan over to Dean Witter.  Dean Witter then used the Kemper employees' access to Kemper confidential client information in order to avoid the usual costs and years of work necessary to create a client base to support a large number of new employees.

9.     On information and belief, Dean Witter intended to decimate Kemper's Springfield branch office so that it would no longer be able to effectively compete with the Dean Witter branch office.

10.     On information and belief, Dean Witter's ultimate goal was to effectuate the closure of Kemper's Springfield branch office.

11.     The Springfield raid marks the fourth time in the past fifteen months that Dean Witter has raided a Kemper branch office.  In July of 1993, Dean Witter raided Kemper's San Rafael, California branch office. In August of 1993, Dean Witter raided Kemper's Madison, Wisconsin branch office.  In September of 1993, Dean Witter raided Kemper's Wausau, Wisconsin branch office.  Less than two weeks ago, Kemper and Dean Witter settled the litigation arising out of those raids.

3

## KEMPER'S SPRINGFIELD BRANCH OFFICE

12.    In February of 1990, Kemper's predecessor, Blunt Ellis & Loewi, purchased Dixon Bretscher Noonan Inc. ("DBN") pursuant to a written contract. At that time, P. Noonan was the president and owner of DBN.

13.    Upon purchasing DBN, Kemper acquired DBN's entire brokerage operation, including but not limited to all books, records, and customer documents.

14.    Since purchasing DBN, Kemper has invested substantial resources and funds in its Springfield branch office to develop and maintain new and existing clients. Included in these client development and maintenance expenses are staff salaries and benefits, national and local advertising budgets, back office support, research support, overhead expenses for rent and utilities, computer hardware and software, training expenses, and other expenses for client entertainment, seminars and similar events.

15.    Until the raid on October 7, 1994, Kemper employed five registered representatives and P. Noonan, the branch manager, at its Springfield branch office. P. Noonan was both a senior vice-president and registered principal of Kemper. In addition, Kemper employed a support and operations staff consisting of three persons at the Springfield branch office.

16.    As registered representatives for Kemper, the Defendant Brokers duties' included effecting securities transactions for existing clients and developing new client relationships for Kemper. In order to perform their duties effectively, the registered representatives, including the Defendant Brokers, utilize information and services provided by Kemper, including clearing facilities, research services, custodial services and other services.

4

17.    P. Noonan and the registered representatives were utterly dependent upon Kemper to conduct any business at all with Kemper's clients. Kemper provided all of the tools needed by its representatives in the various branch offices, including the offices, computers, telephone and data services, and sales and back-office personnel to process and complete securities trades. Under applicable rules of the National Association of Securities Dealers and the securities exchanges, as self-regulating bodies under the securities laws, the Defendant Brokers could not have provided services to any client but for their employment as registered representatives for Kemper.

18.    Kemper has invested considerable time, effort and expense to develop and maintain its client base for the Springfield office. In order to service client accounts effectively and properly, and to comply with state and federal securities laws and regulations, as well as the rules of self-regulatory organizations ("SRO's") such as the NASD and NYSE, Kemper owns and maintains extensive customer records, in hard copy form and in a computer database. The Kemper customer records and the database contain confidential financial and historical information regarding Kemper's clients, including customer identities, addresses, telephone numbers, transactional histories, tax information, personal financial data, banking information and investment objectives, among other data. Kemper client files also contain certain legal documents, such as wills, trusts, pension plans, as well as customer correspondence, stock powers and other required documentation.

19.    This information described in paragraph 18 is not readily available from other sources. Kemper's clients demand that such information be kept confidential and provide such information because of express and implied assurances that the information and data will

5

be kept confidential.

20.    Kemper maintains and enforces security rules to safeguard the confidentiality of customer data as well as information concerning the financial performance of its branch offices and its employees.  Registered representatives are expected to maintain the confidentiality of all data regarding the Kemper clients they service from persons other than Kemper employees.  Each registered representative, and every other Kemper employee, is issued on individual password for purposes of accessing Kemper's proprietary computer database, called the "BETA" system.  Every registered representative and other employee is instructed to keep his or her computer password secret to him or herself.  These steps are taken to protect the confidentiality of the information contained in the BETA system.

21.    The Kemper Employee Handbook and the Kemper Compliance and Sales Practice Manual specifically prohibit employees from disclosing confidential client information and other Kemper-proprietary information, or using such information for their own benefit or the benefit of others.  Copies of relevant pages from Kemper's Compliance and Sales Practice Manual are attached as Exhibit 1 to the Affidavit of Brand F. Meyer.

22.    Kemper requires each of its employees to acknowledge in writing the terms of the Employee Handbook and the Compliance and Sales Practice Manual, including Kemper's rules and regulations guarding client information.  As required by Kemper policy, P. Noonan and each of the Defendant Brokers provided written acknowledgement of Kemper's Employee Handbook and Kemper's Compliance and Sales Practice Manual.  Copies of the Defendant Brokers' acknowledgements are attached as Exhibit 2 to the Affidavit of Brand F. Meyer.

23.    As branch office manager, P. Noonan was charged with supervising the

6

activities of the Springfield office's registered representatives to ensure their compliance with Kemper rules and procedures, including steps to protect the confidentiality of Kemper's confidential and proprietary information.

24.    Because of his supervisory position, and as a result of his manager/principal status, P. Noonan had access to all confidential customer information for customers serviced by Kemper's Springfield branch office. P. Noonan also had access to confidential information concerning his branch's profitability and the performance of the brokers under his supervision.

## THE RAID

25.    Dean Witter recruited P. Noonan to leave Kemper to start a new Springfield branch office for Dean Witter and recruit every other employee of Kemper's Springfield office to follow P. Noonan to Dean Witter. Dean Witter requested and received from P. Noonan confidential information concerning his branch's profitability and the performance of brokers under his supervision, including confidential branch financial statements as well as broker performance information.

26.    Dean Witter recruited and hired P. Noonan primarily to lure away the other Defendant Brokers and transfer Kemper's client base and confidential documents and competitive information to Dean Witter's new branch office in Springfield. Dean Witter offered P. Noonan substantial monetary incentives for breaching his fiduciary duties and successfully recruiting his branch to Dean Witter. On information and belief, P. Noonan's total upfront compensation for recruiting his branch to Dean Witter will exceed $300,000.

27.    Dean Witter and P. Noonan subsequently recruited the other Defendant Brokers, as well as the remaining office brokers and staff to leave Kemper and join Dean

7

Witter.

28.    Dean Witter offered the Defendant Brokers substantial monetary incentives to leave Kemper with confidential client information.  On information and belief, the Defendant Brokers were offered bonuses totalling up to fifty percent of the trailing twelve month commissions generated by clients they serviced as a bonus upon joining Dean Witter with Kemper's confidential client information.  On information and belief, the Defendant Brokers will also receive enhanced commission payouts for the next year on any transactions effected by Kemper's clients at Dean Witter, as well as a "look-back" bonus for those Kemper clients the Defendant Brokers convince to transfer their accounts to Dean Witter. Thus, Defendant Hardy stands to receive up to $75,000, Defendant C. Noonan, up to $90,000, Defendant T. Noonan, up to $30,000, Defendant Patton, up to $225,000, and Defendant Seitz, up to $80,000, for breaching their fiduciary duties to Kemper and providing Dean Witter with confidential information regarding Kemper clients.

29.    While still employed by Kemper, P. Noonan and the Defendant Brokers copied confidential client information as well as other proprietary and confidential business records in preparation for the move.  P. Noonan and the Defendant Brokers provided these documents to Dean Witter while still employed by Kemper to enable Dean Witter to prepare solicitation letters, automated customer account transfer ("ACATS") forms and other Dean Witter documentation, using hard copy documents stolen from Kemper's Springfield branch office.

30.    P. Noonan actively cooperated in these efforts and recruited both Kemper sales and office staff on behalf of Dean Witter while still employed by Kemper.   Moreover, P. Noonan was well aware of the fact that the Defendant Brokers had provided Kemper's

8

confidential client documents to Dean Witter.

31.    On information and belief, P. Noonan was also well aware of the fact that the Defendant Brokers had destroyed documents in order to hinder Kemper in its efforts to rebuild its Springfield branch office.  On information and belief, the Defendant Brokers filled two 55-gallon garbage cans with documents during regular business hours on Monday and Wednesday, October 3 and 5, 1994, which documents were later destroyed by building management.  On information and belief, P. Noonan and the Defendant Brokers were packing boxes full of Kemper documents as of Monday, October 3, 1994 and removing them from Kemper's Springfield branch office.

32.    Dean Witter and the Defendant Brokers have used Kemper's confidential client information to create a database, which Dean Witter and the Defendant Brokers have used to solicit each and every one of Kemper's clients to transfer their accounts to Dean Witter. Using the database compiled from Kemper's confidential customer documents, Dean Witter prepared solicitation letters on behalf of the Defendant Brokers in advance of their departure from Kemper on October 7.  On information and belief, Dean Witter bulk-mailed the solicitation letters before P. Noonan and the Defendant Brokers had resigned.

33.    Brand F. Meyer ("Meyer") is Kemper's Executive Vice President and Regional Director for the area encompassing Springfield, Illinois.  As manager of Kemper's Springfield branch office, P. Noonan reported to Meyer.

34.    Meyer had visited the Springfield branch office as recently as August of 1994. At no time during this visit did P. Noonan or any of the other Defendant Brokers indicate to Meyer that they were considering leaving Kemper or moving to a competitor.

9

35.     To cover up his own and the Defendant Brokers' participation in the impending raid, on September 27, 1994, P. Noonan sent a Strategic Planning Memorandum to Meyer. In this memorandum, P. Noonan stated that among his goals as a branch manager for the coming year were to "recruit a $200,000 [broker]" and "remove uncertainty and distraction from the minds of brokers and staff regarding the future." To achieve these goals, P. Noonan stated that he intended to "continue to 'sell' KSI to brokers." In addition, P. Noonan advised Kemper to include himself and each of the Defendant Brokers for 1995 budgeting purposes. In another part of the memorandum, P. Noonan stated that "retention [of brokers] is no problem," despite his knowledge and participation in the preparations for the raid.

36.     At approximately 1:30 p.m. on October 7, 1994, Meyer arrived at Kemper's Springfield branch office. Upon Meyer's arrival, the office was empty except for P. Noonan and Barbara Fleck, the operations manager. Meyer followed P. Noonan to his office, where Meyer noticed that pictures and other framed items had been removed from the walls and were leaning against P. Noonan's desk.

37.     P. Noonan then informed Meyer for the first time that he had received letters of resignation from Patton, C. Noonan, T. Noonan, Hardy and Seitz. None of the resignation letters indicated the Defendant Brokers' future plans. In response to Meyer's question in this regard, P. Noonan informed Meyer that the Defendant Brokers were now employed by Dean Witter. P. Noonan also confirmed that two members of the support staff, Mary Ann Schroeder and Michelle Rogers, had submitted their resignations and joined Dean Witter. In summary, all office personnel except for Pat Noonan and Barbara Fleck had resigned prior to Meyer's arrival.

10

38.     In response to Meyer's questioning regarding whether the Defendant Brokers had removed any documents from Kemper's office, P. Noonan admitted that copies of customer records had possibly been made at a local copy center.

39.     Meyer asked P. Noonan if Dean Witter had an office in Springfield. P. Noonan replied that they did not, but that Dean Witter had leased some office space downtown.

40.     In response to Meyer's question regarding whether he had been aware of the Defendant Brokers' plans, P. Noonan said that he was aware that the brokers were concerned about the issues surrounding Kemper's ownership over the past year and a half. P. Noonan stated that he had made an effort to sell the positives of Kemper, and that he did not have any discussions with any of the Defendant Brokers about leaving. Meyer then asked why P. Noonan had not made these concerns known to Kemper management so that Meyer could have discussed the situation with the Defendant Brokers and attempted to resolve it. P. Noonan responded that he did not feel that Meyer's involvement would have been of much help.

41.     Meyer then asked P. Noonan about his intentions. P. Noonan responded that he did not know what he was going to do. P. Noonan remarked that he had just turned 65 and that he may retire. P. Noonan also stated that he did not have the energy to rebuild an office. P. Noonan agreed with Meyer that it was unlikely that he would compete with his two sons, C. Noonan and T. Noonan. However, P. Noonan further stated that he was aware that he had management responsibilities to fulfill, and that he was looking to Meyer for guidance. Meyer again questioned P. Noonan's failure to inform Kemper management of the potential

defections, and pointed out that P. Noonan had already taken the pictures off the walls in his office. Once again, Meyer asked P. Noonan about his intentions. P. Noonan mentioned the need to answer the phones and take care of clients. Meyer assured P. Noonan that someone else could handle those chores if those were P. Noonan's only concerns. P. Noonan then stated that he would resign at 4:00 p.m.

42.    Over the next hour, P. Noonan removed his personal effects, such as pictures, awards, and a TV set, from his office. Meyer watched P. Noonan as he removed his personal effects from the office to ensure that P. Noonan did not attempt to remove any of Kemper's customer records.

43.    P. Noonan tendered a letter of resignation to Meyer in which he claimed that he was exercising his right to retire from Kemper Securities. Noonan had turned 65 on August 19, 1994. In his resignation letter, P. Noonan claimed that "this is a normal retirement."

44.    Unbeknownst to Meyer at the time, on October 5, 1994, P. Noonan had instructed Kemper to liquidate assets in his money market account and issue a check payable to P. Noonan in the amount of $330,000.

45.    P. Noonan left Kemper's Springfield branch office at 3:50 p.m. On his way out the door, P. Noonan told Meyer that he was going to think about his future over the weekend. He further stated that Dean Witter may be willing to talk to Kemper about Kemper's office space if Kemper wanted to get out of the lease.

46.    At no time during Meyer's visit did he talk to the operations manager, Barbara Fleck regarding her plans or employment status at Kemper. Nevertheless, in the resignation

letter that Fleck left in the reception area, Fleck claimed she was told that her "services were no longer needed" and that she "was let go due to the fact that her position is being dissolved." Fleck immediately joined Dean Witter upon resigning her position with Kemper.

47.    On Monday, October 10, 1994, an advertisement appeared in the Springfield State Journal Register, announcing the opening of Dean Witter's new Springfield branch office at 500 East Monroe. The advertisement mentions P. Noonan, each of the Defendant Brokers, as well as each member of the support staff. A true and correct copy of the advertisement is attached hereto as Exhibit 1.

48.    Immediately after P. Noonan resigned, Meyer caused all of the locks at Kemper's Springfield branch office to be changed to prevent any former employees from gaining access. Meyer subsequently discovered that customer records had been removed from P. Noonan's office. Further, filing cabinets and desk drawers in the Defendant Brokers' offices had been emptied.

49.    Upon investigation by Kemper's compliance staff, the following documents were also removed from Kemper's Springfield branch office:

(a)    the majority of the original incoming customer correspondence for 1994;

(b)    customer 3x5 inch customer index cards which include customer name and address information, as well as coded confidential customer account information;

(c)    all of the Defendant Brokers' client files;

(d)    certain original posting records and original customer new account forms;

(e)    order tickets for three of the Defendant Brokers;

(f)    the original broker copy of customer monthly account statements.

13

for clients previously serviced by Defendant Hardy prior to
September of 1994;

(g)    an internal report of assets under management, which lists the
value of each customer's holdings as of August, 1994.

In addition, the mutual fund statements were left in such disarray that Kemper is unable to

ascertain at this time whether any are missing.

## FIRST CAUSE OF ACTION
### (Misappropriation of Trade Secrets)

50.    Kemper realleges and incorporates by reference paragraphs 1 through 49 above,

as if fully set forth in this paragraph.

51.    Kemper closely guards the client information and database as described in

paragraphs 18 through 23 above. This information is not revealed beyond the employees and

agents of Kemper's Springfield branch office, as well as certain supervisory personnel who

must use this data to perform their duties for Kemper and fulfill certain functions under state

and federal securities statutes and regulations.

52.    Kemper's customer list has independent economic value because there is no

legitimate way for competitors such as Dean Witter to know which persons, out of the infinite

potential market of investors, are proven consumers of investment products and services.

53.    Kemper's client information and database maintained at the Springfield office,

including the customer names, addresses and the current and historical account data, constitute

trade secrets under the Illinois Uniform Trade Secrets Act ("UTSA"), 765 ILCS 1065 et seq.

54.    Defendant Dean Witter, through P. Noonan and the Defendant Brokers who

maintained confidential relationships with Kemper, caused Kemper's client information

14

maintained at the Kemper branch office to be disclosed to Dean Witter through improper means, including but not limited to inducement of a breach of duty to maintain secrecy.

55.    P. Noonan and the other Defendant Brokers caused Kemper's client information maintained at the Kemper office to be wrongfully disclosed to Dean Witter for purposes of soliciting customers to transfer their accounts to Dean Witter.

56.    Dean Witter, P. Noonan and the Defendant Brokers, as co-conspirators, pursued a common plan and design to intentionally and maliciously misappropriate Kemper trade secrets.

57.    Dean Witter, P. Noonan and the Defendant Brokers have used and will use the customer data to harm Kemper unless restrained by this Court.

WHEREFORE, plaintiff prays for relief as more fully set forth below.

## SECOND CAUSE OF ACTION
### (Breach of Fiduciary Duty and Duty of Loyalty)

58.    Kemper realleges and incorporates by reference paragraphs 1 through 57 above, as if fully set forth in this paragraph.

59.    As a senior vice-president, manager and registered principal of Kemper, P. Noonan owed Kemper the duty of loyalty and certain other fiduciary duties. P. Noonan stands in a confidential relationship regarding the trade secrets and other confidential data known only to Kemper managers.

60.    P. Noonan failed to advise Kemper supervisory personnel about his own and the other Defendant Brokers' intentions to leave Kemper's Springfield office. P. Noonan failed to advise Kemper of his intention to recruit the remaining Defendant brokers.

61.    On information and belief, P. Noonan misappropriated trade secrets from

15

Kemper, including confidential customer data and historical and current customer account data, as well as branch office revenue and profitability information and data concerning the Springfield office registered representatives.

62.    The Defendant Brokers, as registered representatives and employees of Kemper, owed Kemper the duty of loyalty and certain other fiduciary duties. The Defendant Brokers stand in a confidential relationship regarding Kemper's trade secrets and other confidential client data.

63.    With P. Noonan's full knowledge and consent, the Defendant Brokers misappropriated trade secrets from Kemper, including confidential client information and current and historical client account data.

64.    P. Noonan's intentional misconduct constitutes a breach of the fiduciary duties and duty of loyalty he owed to Kemper as a senior vice president, registered principal and branch office manager.

65.    The Defendant Brokers' intentional misconduct constitutes a breach of the fiduciary duties and duties of loyalty they owed to Kemper as registered representatives and employees.

66.    Kemper was and continues to be harmed by P. Noonan's and the other Defendant Brokers' breaches of their fiduciary duties.

WHEREFORE, Kemper prays for relief as more fully set forth below.

### THIRD CAUSE OF ACTION
### (Aiding and Abetting Breach of Fiduciary Duty and Conspiracy)

67.    Kemper realleges and incorporates by reference paragraphs 1 through 66 above, as if fully set forth in this paragraph.

16

68.    As a senior vice president, branch manager and registered principal of Kemper, P. Noonan owed Kemper the duty of loyalty and certain other fiduciary duties. P. Noonan stands in a confidential relationship regarding the trade secrets and other confidential data known only to certain Kemper managers.

69.    The Defendant Brokers, as registered representatives and employees of Kemper, owed Kemper the duty of loyalty and certain other fiduciary duties. The Defendant Brokers stand in a confidential relationship regarding Kemper's trade secrets and other confidential client data.

70.    Dean Witter was aware of the fiduciary duties owed by P. Noonan and the Defendant Brokers to Kemper.

71.    By their conduct, as described herein, P. Noonan and the Defendant Brokers breached their fiduciary duties owing to Kemper.

72.    Dean Witter intentionally and wrongfully lent substantial assistance to aid P. Noonan and the Defendant Brokers in breaching their fiduciary duties.

73.    Dean Witter and P. Noonan, as co-conspirators, pursued a common plan and design to intentionally and maliciously aid the Defendant Brokers in breaching their fiduciary duties.

74.    Kemper was and continues to be harmed P. Noonan's and the Defendant Brokers' breaches of their fiduciary duties, as aided and abetted by Dean Witter and P. Noonan.

WHEREFORE, plaintiff prays for relief as more fully set forth below.

## FOURTH CAUSE OF ACTION

17

(Unfair Competition)

74.    Kemper realleges and incorporates by reference paragraphs 1 through 73 as if fully set forth in this paragraph.

75.    As set forth above, Dean Witter, P. Noonan and the Defendant Brokers, acting on behalf of Dean Witter but while still employed by Kemper, misappropriated and used Kemper's confidential client information to solicit Kemper clients.

76.    As set forth above, Dean Witter and P. Noonan, acting on behalf of Dean Witter but while still employed by Kemper, engaged in a consistent course of conduct to solicit and hire the Defendant Brokers while they were still employed by Kemper.

77.    The Defendants' acts as set forth herein constitute unfair competition under Illinois law.

78.    As set forth above, the Defendants' acts in unfair competition with Kemper were intended to and did cause injury to Kemper.

79.    Unless enjoined, the Defendants' acts in unfair competition with Kemper will continue to cause harm to Kemper.

WHEREFORE, plaintiff prays for relief as more fully set forth below.

## FIFTH CAUSE OF ACTION
### (Tortious Interference with Business Relationships)

80.    Kemper realleges and incorporates by reference paragraphs 1 through 79 as if fully set forth in this paragraph.

81.    Kemper enjoyed valid business relationships with thousands of clients whom Dean Witter has and will wrongfully compete for and solicit.

82.    Kemper also enjoyed valid business relationships with each of the employees

18

of its Springfield branch office, including P. Noonan and the Defendant brokers.

83.    Dean Witter knew of the relationships between Kemper and its clients and Kemper and its employees.

84.    Dean Witter has intentionally interfered with the Kemper's business relationships by recruiting away the entire sales and support staff of Kemper's Springfield branch office in order to gain access to Kemper's confidential customer information and client base. Dean Witter further interfered with Kemper's business relationships with its clients by soliciting Kemper's entire client base to transfer their accounts to Dean Witter and terminate their relationship with Kemper.

85.    Kemper has been and will be damaged by Dean Witter's tortious interference with Kemper's business relationships.

86.    Dean Witter's ongoing acts of tortious interference constitute transgressions of a continuing nature, for which Kemper has no adequate remedy at law.

WHEREFORE, plaintiff prays for relief as more fully set forth below.

### REQUEST FOR INJUNCTIVE RELIEF

87.    Plaintiff realleges and incorporates by reference paragraphs 1 through 86 as if fully set forth in this paragraph.

88.    But for an exercise of the equitable powers of this Court, Kemper will be irreparably injured and harmed through Dean Witter, P. Noonan's and the Defendant Brokers' misappropriation of Kemper's trade secrets and Kemper's confidential client information.

89.    Kemper will be further irreparably harmed by Dean Witter, Illinois and the Defendant Brokers' use of and disclosure of Kemper trade secrets, unfair competition and

19

tortious interference with Kemper's client relationships.

90.     Kemper has no adequate remedy at law.

91.     Kemper has not presented a petition for this same relief or any part thereof to any other court, nor has this relief been previously refused by any court.

92.     Kemper is entitled to injunctive relief pursuant to the UTSA, 765 ILCS 1065/3, as well as common law unfair competition, breach of fiduciary duty and breach of loyalty precedents.

WHEREFORE, Plaintiff, Kemper Securities, Inc., respectfully requests that the Court order the following:

(1)     all Defendants be required to immediately return all Kemper confidential and proprietary customer information and data, including all originals, photocopies, derivatives or compilations, regardless of medium or form, including all hard copy, computer disks, tapes;

(2)     all Defendants be enjoined from copying any Kemper documents or data;

(3)     the Defendant Brokers be enjoined from transferring any of Kemper's confidential and proprietary information to Dean Witter or any other broker-dealer;

(4)     all Defendants be enjoined from using any of Kemper's proprietary information in the course of their business, occupation or employment;

(5)     all Defendants be enjoined from using any of Kemper's proprietary information to solicit Kemper customers;

(6)     that Kemper be allowed its attorneys' fees and costs of this proceeding pursuant to 765 ILCS 1065/5; and

(7)     such other relief as this Court deems fair and equitable.